The NORTHERN PAIUTE NATION, et al.

v.

The UNITED STATES.

No. 87–A.

United States Claims Court.

July 11, 1985.

I.S. Weissbrodt, Washington, D.C., for plaintiffs, Abe W. Weissbrodt, Weissbrodt & Weissbrodt, Richmond F. Allan, Duncan, Weinberg & Miller, Washington, D.C., of counsel.

James M. Upton, Washington, D.C., with whom was Asst. Atty. Gen. F. Henry Habicht II, Washington, D.C., for defendant.

## OPINION

LYDON, Judge:

■ In this Indian Claims case, the Walker River Tribe, one of six organized tribes of the Northern Paiute Nation, seeks damages based on defendant's alleged failure to honor its obligation to provide an irrigation system sufficient to irrigate 10,-000 acres of land on the Walker River Reservation in Nevada.[1] The court has before it defendant's motion for summary judgment asserting that this irrigation claim by the Walker River Tribe is outside the jurisdiction of this court because it is an aggregate of individual Indian claims as opposed to a unitary tribal claim. Plaintiff opposes defendant's motion contending that its claim is tribal in nature. After review of the facts, pertinent statutes, documents, relevant case law, and the submissions of the parties, and after oral argument, the court concludes that it does have jurisdiction over plaintiff's irrigation claim and thus defendant's motion for summary judgment must be denied.

I.

The following is a narrative of those facts which the court finds relevant to the jurisdictional issue presented in this case.

Plaintiff, the Walker River Tribe, is a tribal organization formed under the Indian Reorganization Act of June 18, 1934, 48 Stat. 987, 988, 25 U.S.C. § 476, 477. The Secretary of the Interior has acknowledged plaintiff's authority to represent its enrolled members. Plaintiff was previously known as the Pah Ute Indians of the Walker River Reservation.

The Pah Ute Indians were originally members of the aboriginal Northern Paiute Nation. The aboriginal territory of the Northern Paiutes encompassed more than 20 million acres in the northwestern section of the United States. In the mid-1800s the Department of the Interior selected tracts of land within the Northern Paiute Indian territory to serve as reservations for various tribal entities. The federal government then acted to induce the various Indian groups to move and settle upon the new reservations. *Northern Paiute Nation v. United States*, 225 Ct.Cl. 275, 278, 634 F.2d 594, 596 (1980). Eventually the Pah Ute Indians, now the Walker River Tribe (plain-

---

[1] This irrigation claim is only one of several claims presented by the Walker River Tribe in this case. This case also involves other claims by other tribes. *See Northern Paiute Nation v. United States,* 225 Ct.Cl. 275, 276 n. 1, 634 F.2d 594, 595 n. 1 (1980).

tiff), were induced to settle on the Walker River Reservation in Nevada.

The Walker River Reservation was originally set apart by the Department of the Interior for the Pah Ute Indians in 1859. *See* 27 Ind.Cl.Comm. 39 (1972). This reservation is located in west central Nevada, about 70 miles southeast of Reno, Nevada. It originally encompassed approximately 320,000 acres of which Walker Lake, which was 22 miles long and 8 miles wide, was a part. About two-thirds of the land area of the reservation was rugged mountain and timber country. However, there was also several thousand acres of riverbottom land along both sides of the Walker River which flows from the northwestern corner of the reservation in a southeasterly direction for about 25 miles before emptying into Walker Lake. The entire reservation is located in the Walker River Subbasin. The area is quite arid and farming required irrigation from the Walker River. The Walker River, which begins in the Sierra Nevada mountains in California, west of the reservation, is fed primarily by melting snow pack. As a result, river flows generally are large in the spring and early summer and low during the remaining parts of the year.

In their aboriginal territory the Northern Paiute Indians lived on hunting, fishing, and the gathering of wild food. They were not farmers. However, when the Pah Ute Indians settled on the Walker River Reservation there was not enough suitable land to sustain their former lifestyle. Both the government and the Indians soon realized that the Indians would have to begin farming as their primary means of subsistence. It was evident that the Indians would need financial and technical assistance from the government in order to acquire seed and farming tools and to develop the necessary irrigation system to water the arid ground. It was clear at this early stage that an irrigation system of some sort would be necessary if farming were to be undertaken in this arid region. Rough irrigation ditches were dug in the late 1800's.

The State of Nevada had insufficient resources to help the Indians develop their new agricultural way of life. The population in the Walker River Reservation, which at one time reached 1500 Indians in 1872, dwindled to around 500 in 1875 due to crop failures precipitated by an inadequate irrigation system, insufficient funding, and encroachment by white men. The population on the Reservation averaged around 500 from 1876 to 1908 (population ranged from a low of 381 to a high of 601). However, there was insufficient irrigated farm land (1000 acres) to support the Indians who lived on the reservation.

In order to expand the amount of farmland on the reservation, the irrigation system, consisting basically of ditches and temporary dams, had to be expanded. In order to expand the irrigation system adequately a dam or reservoir was needed to store the surplus spring flows of the Walker River to be used in the dryer months. Such a reservoir would hopefully alleviate any concerns about upstream users of the Walker River water. Such diversions began to seriously eat into the normal flow of the Walker River in the late 1800's. However, it was felt that a dam with the capacity to store the excess spring flows would solve this diversion problem. Government officials suggested that the mineral lands, located on nonfarming lands of the Walker River Reservation, be sold in order to finance such a reservoir and attendant irrigation project.

In a June 19, 1900, letter, Frank M. Conser (Conser), Superintendent of Indian Schools, set out his recommendations regarding the Walker River Reservation to the Commissioner of Indian Affairs. First, he recommended that the rich mineral lands on the reservation be sold for about 50 cents per acre ($125,000) and the proceeds be utilized "for the construction of a storage reservoir, irrigating ditches, purchase of cattle, farm implements etc." for the benefit of the Indians on the reservation. This recommendation would reduce the reservation to about 75,000 acres, including all the irrigable land and common pasture land suitable for grazing cattle. He found potentially 8,000 to 12,000 acres

of irrigable land. He recommended that this irrigable land be surveyed into 20-acre parcels and allotted to the members of the tribe.

Conser stated, however, that without an adequate irrigation system, including a reservoir, the allotment efforts would be "a useless expenditure of money." He stated further:

All of the Indians belonging to the reservation should be compelled to reside thereon if it were possible for them to make a living there but in fact the surveying and allotting of land to them on the reservation in addition to what is now being cultivated will be a useless expenditure of money unless they are assured of a sufficient amount of water to enable them to raise a crop and the only way to do this is to provide a means of storing the surplus that comes down the Walker River during the spring months. When the snow in the mountains melts in the spring there is always an abundance of water in the river that cannot be utilized but as soon as the snow is gone, usually about the middle of June, the supply in the river on the reservation diminishes very rapidly, generally by about the middle of July the river is dry and year by year the regular supply from the river is gradually diminishing because of the increased appropriation of the water in the valleys above the reservation. I observed this particularly in Mason Valley which adjoins the reservation on the West where new land is being broken, new ditches are being constructed and old ones extended and enlarged.

The only way of assuring these Indians of a permanent supply of water for the land they should have under irrigation is by a storage reservoir. * * *[2] [Footnote added.]

Conser felt that providing the Indians with an adequate agricultural means of subsistence would keep them on the reservation and away from the "evil influences" the Indians often encountered in the surrounding towns.[3]

While the Pah Ute Indians on the Walker River Reservation were suffering due to insufficient irrigable land on which to grow an adequate food supply and while certain government officials were making recommendations to improve the Indians' situation, a gradual movement was also stirring to reduce the size of the Walker River Reservation so that white men could gain access to the valuable minerals located on a portion of the reservation. In 1891, the Nevada Legislature adopted a joint resolution urging that the reservation be reduced in size while maintaining "all agricultural and grazing lands and water privileges" for the Indians. Several bills were also introduced in the United States Congress in subsequent years which were designed to open up these mineral lands.

Efforts to reduce the size of the Walker River Reservation were unsuccessful until government officials, such as Conser (*see also* note 3), advocated a reduction in size of the reservation accompanied with a proposal to benefit the Pah Ute Indians with the development of an irrigation system to provide an adequate water supply to irrigate the reservation's farm lands. These government officials also advocated allotting the irrigable land on the reservation to the members of the Tribe. These recommendations eventually resulted in the passage of the Act of May 27, 1902, 32 Stat. 245, 260–61, the Joint Resolution of June 19, 1902, 32 Stat. 744 and the Act of June 21, 1906, 34 Stat. 325, 358, along with the

---

2. Conser estimated the cost of a reservoir to be at least $50,000 with the necessary attendant ditch system costing about $10,000.

3. Subsequent to Conser's report, other government officials recommended a similar course of action, *i.e.*, sell parts of the reservation, and provide an improved irrigation system. In a June 3, 1901, report, Special Agent Frank C.

Armstrong made such recommendations to the Secretary of the Interior. In his annual reports to the Commissioner of Indian Affairs dated August 21, 1899, and August 22, 1901, James K. Allen, Superintendent of the Indian Industrial School at Carson, Nevada, and Superintendent in Charge of the Walker River Agency, made similar recommendations.

adoption of the Agreement of July 20, 1906.

The Act of May 27, 1902, 32 Stat. 245, 260–61 set out the plan to allot the irrigable land on the Walker River Reservation and the subsequent cession by the Indians of the reservation land in excess of the needed irrigable land. The Act stated in pertinent part:

That the Secretary of the Interior be, and he is hereby, directed to allot from the land on the Walker River Reservation in Nevada susceptible of irrigation by the present ditches or extensions thereof twenty acres to each head of a family residing on said reservation, the remainder of such irrigable land to be allotted to such Indians on said reservation as the Secretary of the Interior may designate, not exceeding twenty acres each; and when a majority of the heads of families on said reservation shall have accepted such allotments and consented to the relinquishment of the right of occupancy to land on said reservation which can not be irrigated from existing ditches and extensions thereof and land which is not necessary for dwellings, school buildings or habitations for the members of said tribe, such allottees who are heads of families shall receive the sum of three hundred dollars each to enable them to commence the business of agriculture, to be paid in such manner and at such times as may be agreed upon between said allottees and the Secretary of the Interior. And when such allotments shall have been made, and the consent of the Indians obtained as aforesaid, the President shall, by proclamation, open the land so relinquished to settlement, to be disposed of under existing laws. And the money necessary to pay said Indians is hereby appropriated out of any money in the Treasury not otherwise appropriated.

The Joint Resolution of June 19, 1902, 32 Stat. 744, added to the Act of May 27, 1902 by providing that, before the Pah Ute Indians gave up their land in excess of the needed irrigable land, they were also enti-

tled to some grazing land. The resolution stated in relevant part:

In addition to the allotment in severalty of lands in the Walker River Indian Reservation in the State of Nevada, the Secretary of the Interior shall, before any of said lands are opened to disposition under any public land law, select and set apart for the use in common of the Indians of that reservation such an amount of nonirrigable grazing lands therein at one or more places as will subserve the reasonable requirements of said Indians for the grazing of live stock.

The Act of June 21, 1906, 34 Stat. 325, 358 further added to the Act of May 27, 1902 and the Joint Resolution of June 19, 1902. In addition to the allotted irrigable land and nonirrigable grazing land, Congress directed the Secretary of the Interior to "select and set apart for the use in common of the Indians of said reservation such tract or tracts of timber land therein at one or more places as will subserve the reasonable requirements of said Indians for fuel and improvements" before any excess reservation lands were to be opened for disposition.

The three acts of Congress set out above essentially indicate to what the Pah Ute Indians were entitled in exchange for ceding the remainder of the Walker River Reservation lands to the government. An irrigated allotment for each head of a family, the $300 for each head of a family, the grazing land, and the timberland constituted consideration for their agreement to relinquish the right to occupy the remainder of the reservation land which was to be opened to the public.

The Agreement of July 20, 1906 formalized the Pah Ute Indians' consent to the cession of a large portion of their reservation land in exchange for the consideration set out above. The agreement was signed by 108 Indians. The Act of May 27, 1902, required a majority of the heads of families on the reservation to accept the allotments and to consent to the relinquishment of the right to occupy the remaining reservation land. The Agreement of July 20, 1906

stated that there were 140 heads of families living on the reservation and that a majority thereof had consented to the allotment and relinquishment of land as required by the Act of May 27, 1902.

The Agreement of July 20, 1906, signed by 108 Pah Ute Indians and William E. Casson, Special Allotting Agent acting for the United States, ceded about 268,000 acres of the total 320,000 acre reservation to the United States. This 268,000 acres included the valuable mineral lands which many had toiled for so long to open up to prospecting and mining. These lands were opened for entry pursuant to a Proclamation of the President dated October 29, 1906.

After ceding 268,000 acres of reservation land to the government, the Indians were left with about 51,000 acres. Of that 51,-000 acres 10,000 acres of irrigable lands were allotted and 280 acres were for agency, school and church purposes, as set out in the Act of May 27, 1902, and the July 20, 1906, Agreement. Pursuant to the Act of June 19, 1902, 37,400 acres were set aside as common grazing land. Finally, 3,300 acres of timber land were retained pursuant to the Act of June 21, 1906.

Between the passage of the Act of May 27, 1902, and the signing of the Agreement of July 20, 1906, the government made efforts to allot the irrigable lands and to study means to provide the necessary irrigation. In a letter dated October 30, 1905, and approved by the Secretary of the Interior on November 3, 1905, William E. Casson (Casson) was informed that he had been assigned to make the allotments on the reservation. Pursuant to the Act of May 27, 1902, the letter designated that each Indian of the reservation receive a 20-acre allotment if possible. Eventually, 504 allotments were made by Casson which comprised 10,080 acres.[4]

Measures were also taken from 1902 to 1906 to prepare for the provision of an adequate irrigation system to supply vital water to the irrigable lands which would be allotted as required by the Act of May 27, 1902. The existing irrigation facilities were studied and plans were developed to extend the existing ditches to provide irrigation for all the allotted lands. These studies pinpointed the areas of irrigable land which should be allotted to the Indians and it was from that irrigable land that Casson made the allotments. In the March 3, 1903, Act, *supra,* Congress made a general appropriation of $150,000 for " * * * the construction of ditches and reservoirs, purchase and use of irrigating tools and appliances, and of water rights on Indian reservations, in the discretion of the Secretary of the Interior and subject to his control * * * ".

While plans were being made regarding the extension of the existing irrigation system, concerns again surfaced regarding the adequacy of the flow of the Walker River during the growing season to provide sufficient water for an irrigation network. Apparently, upstream users of the river were diverting more and more water.[5] These

---

4. Congress had previously passed Acts, *i.e.,* the Act of July 1, 1902, 32 Stat. 552, 569 and March 3, 1903, 32 Stat. 982, 997, directing that the allotment surveys be done and appropriating money to do the work.

5. As of 1903, increased use of the water of the Walker River created problems. In the early days there was an abundance of water and the Indians and white settlers had little problems. As settlers upstream of the Reservation increased, the downstream reservation, and indeed the increased settlers upstream, began to experience at times an inadequate water supply. Upstream appropriators of the Walker River made adverse priority claims to the waters of said river which resulted in a suit around 1902 in the United States Circuit Court for the District of Nevada. The Secretary of the Interior, relative to this litigation, requested the Attorney General of the United States on September 23, 1903, "to take such action as may be necessary and proper to secure and protect the right of the United States and of the Indians of the Walker River Reservation, to the use of water for irrigation on said reservation." This request was honored and the United States subsequently entered the litigation to protect its water rights and the water rights of the Walker River reservation. *See United States v. Walker River Irr. Dist.,* 11 F.Supp. 158 (D.Nev.1935), *reconsid. denied,* 14 F.Supp. 10 (D.Nev.1936), *reversed,* 104 F.2d 334 (9th Cir.1939).

actions of the upstream users combined with naturally low flows in the months of July through October essentially cut off the water for irrigation in those vital months. It became clear that allotting "irrigable" land to the Indians would be worthless to the Indians without the assurance that a sufficient water supply would exist.

In a July 22, 1905, letter, the Acting Commissioner of Indian Affairs directed James R. Meskimons (Meskimons), Superintendent of Irrigation, to study the irrigation problems on the Walker River Reservation. He was informed that about 10,000 acres would have to be irrigated. In his report dated January 19, 1906, Meskimons reported that only a little over 1400 acres of land within the Reservation were being cultivated to which water, if available, could reach through the existing irrigation system. However, since the white farmers living upstream were diverting so much water, the Indians received little or no water especially during the dry months. There were additional "tillable" lands on the reservation, which only received water during high water periods, which could also be irrigated.

One of Meskimon's duties in studying the irrigation system on the reservation was to ascertain the Indians' water rights as against those of the upstream users. Meskimons concluded in his January 19, 1906, report in pertinent part:

> [I]t is my opinion that if we succeed in getting a priority of right for 300 or 400 acres and a pro rata right for the other 1000 acres which is already under cultivation, that it is as much as we can expect, and that we must look to the excess or flood water, or to pumps for the irrigation of the tract of land before mentioned [10,000 acres].

Therefore, based on Meskimons views, the Indians would be unable to acquire sufficient water rights to irrigate 10,000 acres using an extension of the existing irrigation system.

Since Meskimons concluded that the Indians would not be able to obtain the neces-

sary water right priorities, he suggested alternative sources of irrigation in his reports of January 19 and March 2, 1906. In addition to suggesting the pumping of water from wells or Walker Lake, Meskimons also suggested the construction of a reservoir on a natural dry lake site. Such a reservoir could store the river's excess flow and provide a water supply sufficient to irrigate the 10,000 acres even during the drier months. Apparently, the United States controlled the area where the proposed reservoir would be located and Meskimons urged the government to secure the site for the Indians.

A subsequent study of this water supply problem by William H. Code (Code), Chief Irrigation Engineer, dated July 7, 1906, confirmed Meskimons' conclusions regarding the Indians' limited water rights priority. Code also confirmed that the reservoir site selected by Meskimons was ideal. However, Code found that a private individual owned a great deal of the land where the potential reservoir would be located. In addition, apparently the United States Reclamation Service, which controlled a part of the site, had no intention of surrendering it for use by the Indians on the Walker River Reservation. Code proposed an alternative irrigation plan which would irrigate 5,000 acres of the allotted land by enlarging and extending an existing irrigation canal and by seeking permission from the State of Nevada "to appropriate 150 cubic feet of water per second of the surplus waters of Walker River for the benefit of the Indians for the contemplated enlarged canal * * *." Code realized this proposal would not meet all of the irrigation needs of the allotted lands but it was a beginning and he observed a "half a loaf is better than no loaf."

On July 18, 1906, the Acting Commissioner of Indian Affairs concurred in Code's recommendation. The Acting Secretary of the Interior subsequently approved the recommendations in a letter dated July 25, 1906. It is clear, however, that the Indians on the Walker River Reservation never received an irrigation system capable of irri-

gating all of their allotted acreage (*i.e.*, 10,000 acres). Defendant does not dispute this fact. Indeed, it is undisputed that the Indians never received even the "half a loaf" mentioned above. This was clearly indicated in a February 1972 Department of the Interior report which stated that a proposed Rehabilitation and Betterment Program for the Walker River Reservation would add irrigation works to serve 1,250 additional acres over the 2,750 acres then being served. The report indicated that the proposed additional irrigation project would mean that "[w]ater can be delivered to Indian landowners holding twenty-acre trust allotment tracts, completing in part, the true intent of an agreement dated May 25 [sic] [July 20], 1906."

On December 26, 1950, the Northern Paiute Nation and six present day organized tribes, including the Walker River Tribe, plaintiff herein, filed a petition under the Indian Claims Commission Act asserting a variety of claims including the one at issue in this case. On April 24, 1957, the Indian Claims Commission (ICC) ordered that the claims for compensation for the taking of the Northern Paiute aboriginal lands be severed. These land claims were designated Docket No. 87. The remainder of the claims, including the one at bar, was reasserted in an amended petition designated Docket No. 87–A. After the land claims in Docket No. 87 were completely adjudicated, proceedings in Docket No. 87–A again commenced. After at least one claim in Docket No. 87–A was separated out and adjudicated, the ICC granted a motion to allow the petition in Docket No. 87–A to be amended and supplemented. This amended petition, which set forth various claims in ten separate counts, was filed with the ICC on July 23, 1975. Defendant's answer to said amended petition was filed with the

ICC on February 18, 1976. On March 2, 1978, Docket No. 87–A was transferred from the ICC to the Court of Claims, this court's predecessor.

Each of the ten counts in Docket No. 87–A constitute separate causes of action. Several of these claims or counts have been separated out and completely adjudicated.[6] The claim at issue in this case is part of plaintiff's claim under Count IV in the petition. Plaintiff asserts under Count IV that defendant failed to provide the Indians a sufficient water supply to irrigate its lands. Plaintiff's brief in this case denotes its claim as one for damages resulting from defendant's failure to construct an irrigation system for the Tribe with the capacity to supply water to the allotted irrigable lands on the reservation.

## II.

In its motion for summary judgment, defendant contends that plaintiff is essentially asserting the claims of individual Indian allottees and not the Tribe as required by 25 U.S.C. § 70a (1976). Defendant asserts that such individual claims are beyond the jurisdiction of the Indian Claims Commission Act, 25 U.S.C. § 70, *et seq.*, and thus outside the jurisdiction of this court. If plaintiff is asserting the claims of individual Indians, defendant is correct is stating that such claims are not within this court's jurisdiction. *See Absentee Shawnee Tribe of Oklahoma v. United States*, 165 Ct.Cl. 510, 514 (1964); *Cherokee Freedmen v. United States*, 161 Ct.Cl. 787, 788 (1963).

Defendant bases its assertion that plaintiff's claim is really that of the individual Indian land allottees on the argument that the water use rights appurtenant to the 10,000 acres of allotted irrigable land

---

**6.** All of the claims of the Pyramid Lake Tribe, *i.e.*, its claims in Counts VII, VIII, IX and X which were separated from Docket No. 87–A and assigned to Docket No. 87–C, were finally adjudicated by the Court of Claims on November 20, 1981. *See Pyramid Lake Tribe v. United States*, 229 Ct.Cl. 872 (1981). All claims of the Fort McDermitt Paiute Shoshone Tribe in Docket 87–A, *i.e.*, its claims in Count X which were

separated from Docket No. 87–A and placed in Docket No. 87–D, were finally adjudicated by this court on June 24, 1983. The "fisheries" claim of the Walker River Tribe, plaintiff herein, was separated from Docket No. 87–A, assigned to Docket No. 87–E, and was terminated by the award of a final judgment by this court on October 19, 1983.

passed to the individual Indians and a failure to supply adequate water for irrigation brings about individual claims of the allottees injured by defendant's admitted failure to act. Defendant contends that its failure to provide an adequate water system only injured the individual allottees to whom the irrigable lands and water rights appurtenant thereto passed pro rata. The Tribe, defendant alleges, was not injured by defendant's acts.

Plaintiff, on the other hand, argues that the primary issue in this case is defendant's admitted failure to provide the Indians on the Walker River Reservation with an irrigation system which would provide an adequate water supply to the 10,000 acres of irrigable land on the reservation. Plaintiff contends that the Act of May 27, 1902, and the Agreement of July 20, 1906, obligated defendant to provide the Tribe with an irrigation system sufficient to irrigate 10,000 acres. Defendant's failure to provide such a system to the Tribe damaged it by depriving the Tribe of a valuable asset, the irrigation system, which plaintiff claims would have belonged to the Tribe. Plaintiff contends that defendant's failure to meet its obligations to the Tribe brings this claim within the confines of 25 U.S.C. § 70a(2).

The court agrees that the wrong at issue at this time is defendant's failure to supply an adequate irrigation system. Defendant was obligated by the Act of May 27, 1902, to provide such a system to the Pah Ute Indians, subsequently renamed the Walker River Tribe. It can be said that defendant's failure to construct the irrigation system either violated that Act or constituted a breach of the Agreement of July 20, 1906, to supply such a system in exchange for the Indians giving up a great deal of their reservation lands. Defendant's breach of its obligation, however characterized, is not in question. What is in question is whether this claim belongs to the individual Indians or to the Tribe.[7]

Defendant contends that the injuries plaintiff is attempting to redress are those of individual Indians in that the deprivation of a sufficient water supply hurt the individual allottees who could not farm their lands. The court agrees that the generality of Count IV of plaintiff's petition could be read to include a claim for damages to the individual Indians. If those were the only damages plaintiff is seeking in this case, this court would be without jurisdiction to hear the claim. See *Absentee Shawnee Tribe of Oklahoma, supra,* 165 Ct.Cl. at 514–15; *Cherokee Freedman v. United States, supra,* 161 Ct.Cl. at 788–89.

Plaintiff, however, in its brief explains that it is seeking damages for the injury suffered by the Tribe in not receiving the

7. Though the issue of water rights is intimately involved in other aspects of this case, the court does not find the rule of *Winters v. United States,* 207 U.S. 564, 28 S.Ct. 207, 52 L.Ed. 340 (1908) (*i.e.,* the doctrine of reserved water rights) and its progeny to be applicable or of great relevance to the particular issue at bar. Whether defendant's failure to provide an irrigation system gave rise to a Tribal claim or individual claims can be determined by reviewing the relevant Acts and Agreements without venturing into the nature of the water rights held by the allottees and the Tribe.

For a detailed discussion of plaintiff's water rights, the application of the *Winters* doctrine thereto, and the history of the Walker River Reservation see *United States v. Walker River Irrigation Dist.,* 104 F.2d 334 (9th Cir.1939). In the above-cited case, the United States, on behalf of the Walker River Tribe, in a suit against the Walker River Irrigation District and certain upstream users of the Walker River, contended that the Walker River Reservation was entitled to enough water (*i.e.,* a natural flow of 150 cubic feet per second) from the Walker River to irrigate some 10,000 acres of irrigable land on the reservation. The Ninth Circuit, however, held that under the *Winters* doctrine, the reservation was only entitled to a natural flow of 26.25 cubic feet per second for 2,100 acres of reservation land. The Ninth Circuit found that the number of Indians living on the reservation had never been large, pointing out that in 1866 the reservation had a population of about 600 and in 1939 the population was about 500, and further concluded, " * * * the number of Indians is not increasing and it has not been shown that there is the necessity or demand for the cultivation of a larger area than 2,100 acres." The Ninth Circuit accepted these figures as "a fair measure of the needs of the reservation as demonstrated by seventy years of experience." *Id.* 104 F.2d at 340.

irrigation system defendant was obligated to provide it. Plaintiff denies that it is asserting any claim at this time for the deprivation of water which could have been utilized to farm the irrigable reservation lands. Plaintiff asserts that it has a separate *tribal* claim based only on defendant's failure to provide the Tribe with an irrigation network.

In this regard plaintiff's claim, as honed by its brief, is much like that presented by the plaintiff in *Fort Sill Apache Tribe v. United States*, 201 Ct.Cl. 630, 477 F.2d 1360 (1973) *cert. denied*, 416 U.S. 993, 94 S.Ct. 2406, 40 L.Ed.2d 772 (1974). In *Fort Sill Apache Tribe*, the plaintiff brought a claim for damages arising from 27 years of internment allegedly suffered by its tribal members. However, the court found that the plaintiff was not "seeking damages for false arrest and imprisonment of each member of the tribe, apparently recognizing that these would be little more than multiple individual claims and therefore outside the jurisdiction of the Indian Claims Commission." *Id.* 201 Ct.Cl. at 634–35, 477 F.2d at 1362 (citations omitted). Instead, the plaintiff in *Fort Sill Apache Tribe* presented a "novel argument" that the alleged years of internment of its tribal members resulted in injuries to the "tribe's traditional power and structure * * *." *Id.* The plaintiff was alleging a "separate and distinct compensable injury to the tribe recoverable under both clause 2 and clause 5 of 25 U.S.C. § 70a." *Id.* 201 Ct.Cl. at 635, 477 F.2d at 1362.

Plaintiff, in this case has similarly asserted that it, the Walker River Tribe, was injured by defendant's failure to construct an adequate irrigation system. It has, at least implicitly, denounced the fact that it is joining, into one claim, many individual Indian claims for damages based on the lack of an adequate irrigation system. Such a claim would clearly be outside the jurisdiction of the court. *Id.* 201 Ct.Cl. at 637, 477 F.2d at 1363–64; *Cherokee Freedmen v. United States, supra*, 161 Ct.Cl. at 789. Therefore, as the Court of Claims found in *Fort Sill Apache Tribe*, the critical issue is "whether there is a distinct cause of action and right resting with the tribe itself." *Fort Sill Apache Tribe v. United States, supra*, 201 Ct.Cl. at 637, 477 F.2d at 1364.

In *Fort Sill Apache Tribe*, the court concluded that the plaintiff's claim based on damage to "the power structure and viability of the tribal unit" was not the assertion of a group interest or right within the intendment of clause 2 of 25 U.S.C. § 70a. *Id.* 201 Ct.Cl. at 638–39, 477 F.2d at 1364. The court found that the Act was not intended to "include a separate and distinct tribal right to recover for injuries so closely tied to those suffered personally by individual Indians, which injuries are the whole basis for any damage to the tribe as such." *Id.* 201 Ct.Cl. at 639, 477 F.2d at 1365. Plaintiff, in this case, argues that its claim for damages is not so closely linked to the potential claims of the individual Indians to be subsumed by such claims. Plaintiff contends that defendant obligated itself by the Act of May 27, 1902, and the Agreement of July 20, 1906, to construct for the Tribe an irrigation system. Irrespective of the fact that the right to use the water carried by the irrigation network itself *may* have passed to the allottees giving them individual claims, plaintiff argues it was damaged by defendant's failure to provide the Tribe with the actual system. Such a system, plaintiff asserts, would have belonged to the Tribe.

Although plaintiff seeks relief under both clauses 2 and 5 of 25 U.S.C. § 70a, the court concludes that plaintiff's claim is more appropriately within the confines of clause 5 of 25 U.S.C. § 70a. Clause 5 is the "fair and honorable dealings" provision. The Court of Claims set out the criteria for a claim of a breach of fair and honorable dealings in *Aleut Community of St. Paul Island v. United States*, 202 Ct.Cl. 182, 480 F.2d 831 (1973). The court stated: "There must be a showing that the United States undertook an obligation, a 'special relationship', the obligation was to the Tribe, that the United States failed to meet its obligation, and that as a result the Tribe suffered damages." *Id.* 202 Ct.Cl. at

196, 480 F.2d at 839. The Court of Claims stated in a previous case: "[T]he United States is held liable under this 'fair and honorable dealings' clause where 'by its own acts, it has undertaken special duties which it has failed to fulfill.' *Lipan Apache Tribe v. United States*, 180 Ct.Cl. 487, 502 (1967)." *Fort Sill Apache Tribe v. United States, supra,* 201 Ct.Cl. at 640, 477 F.2d at 1365. The issue, as presented by plaintiff in this case, is whether defendant undertook a special duty or obligation to provide the *Tribe* with an irrigation system. If defendant undertook no special duty or obligation to the Tribe itself, then plaintiff's claim is outside the pale of the fair and honorable dealings provision of 25 U.S.C. § 70a.

As stated earlier, plaintiff asserts that defendant's obligation or special duty to provide the *Tribe* with an irrigation system arose under the Act of May 29, 1902 and the Agreement of July 20, 1906. The irrigation system was part of the consideration for the Indians agreement to cede 268,-000 acres of land to defendant. The court agrees with plaintiff's assessment of the 1902 Act and 1906 Agreement.

It is arguable that any obligation undertaken by defendant in this case flowed to the individual Indians. The Act of May 27, 1902 referred to the consent of the Indians and not the Tribe. The consent was to be from a majority of the heads of families and not from a Tribal representative. Defendant asserts that communications from the superintendents of the Walker River Reservation both before and after 1902 comprise the legislative history or contemporaneous administrative construction of the 1902 Act. It claims that these documents indicate that the irrigation system was built for the allottees and not the Tribe. The Agreement of July 20, 1906, set forth herein, stated that the Indians, for the consideration stated, ceded and relinquished their reservation lands. The stated consideration included the allotments and $300 for each family head which clearly was consideration to the individual Indians. Therefore, the literal statutory obligation would appear to flow to the individu-

al Indians and the fact that the consideration primarily went to the Tribal members and not the Tribe would suggest that any obligation defendant had was to individual Indians. Such an obligation would not give rise to a tribal claim. However, such a reading of the 1902 Act and 1906 Agreement would be violative of some well-established rules of law.

■ The general rule is that "[w]hatever title the Indians have is in the tribe, and not in the individuals, although held by the tribe for the common use and equal benefit of all the members." *Cherokee Nation v. Hitchcock*, 187 U.S. 294, 307, 23 S.Ct. 115, 120, 47 L.Ed. 183 (1902) (as quoted in *Wilson v. Omaha Indian Tribe*, 442 U.S. 653, 665, 99 S.Ct. 2529, 2536, 61 L.Ed.2d 153 (1979); *United States v. Jim*, 409 U.S. 80, 82, 93 S.Ct. 261, 263, 34 L.Ed.2d 282 (1972)). Felix Cohen, one of the preeminent commentators on Indian law wrote as follows on this ownership rule:

> The interests that Indian tribes hold in real and personal property represent a unique form of property right in the American legal system, shaped by the federal trust over tribal land and statutory restraints against alienation. Tribal property is a form of "ownership in common;" it is not analogous to tenancy in common, however, or other collective forms of ownership known to Anglo-American private property law because an individual tribal member has no alienable or inheritable interest in the communal holding. Rather, *tribal property interests are held in common for the benefit of all living members of the tribe, a class whose composition continually changes as a result of births, deaths, and other factors.* The manner in which a tribe chooses to use its property can be controlled by individual tribal members only to the extent that the members participate in the governmental processes of the tribe. [F. Cohen, *Handbook of Federal Indian Law*, 472 (1982 ed.) ] [emphasis added and footnotes omitted].

Cohen went on to state:

> It is well established that title to the communal land or personal property of a

tribe resides in the tribe itself and is not held by tribal members individually. *An individual member cannot convey title to any particular tract of tribal land and has no right against the tribe to any specific part of tribal property, absent a federal law or treaty granting vested rights to individual members.* In observing that the Cherokee lands were held in communal ownership, the Supreme Court stated: "[T]hat does not mean that each member had such an interest, as a tenant in common, that he could claim a *pro rata* proportion of the proceeds of sales made of any part of them." [citing *Cherokee Trust Funds,* 117 U.S. 288, 308, 6 S.Ct. 718, 727, 29 L.Ed. 880 (1886)].

A member's right to tribal property is no more than prospective and inchoate unless federal or tribal law recognizes a more definite right. An individual has no vested right in tribal land unless some designated interest in it has been set aside for him or her severally or as a tenant in common. [F. Cohen, *supra,* at 605–06] [emphasis added and footnotes omitted].

In this case the Secretary of the Interior selected the 320,000 acre Walker River Reservation and induced the Pah Ute Indians to settle on it. Given the above rule regarding tribal ownership of land, it is clear that the tribal entity (*see infra* note 8) which settled on the reservation was the beneficial owner of the reservation lands as opposed to the individual Indians. (*See infra* note 12 and accompanying text.) Also,

accepting the rule that individual members of the Tribe could not convey title to any particular tract of tribal land, the Tribe in this case would have had to agree to cede the land to the government under the Act of May 27, 1902, and the Agreement of June 20, 1906. This is true even though the 1902 Act referred to a majority of the heads of Indian families agreeing to relinquish their right to occupy the reservation land which could not be irrigated and the 1906 Agreement appeared to seek the consent of individual Indians to cede a portion of the reservation lands. The law and common notion of the day indicated that Indian land was tribally owned, and it is in that light that the 1902 Act and 1906 Agreement must be read. *See Oliphant v. Suquamish Indian Tribe,* 435 U.S. 191, 206, 98 S.Ct. 1011, 1019, 55 L.Ed.2d 209 (1978).

■ Having concluded that the Tribe was the beneficial owner of all the reservation land, any consideration set out in the July 20, 1906, Agreement as well as any governmental obligation to the Indians in the Act of May 27, 1902, flowed to the Tribe in exchange for its cession of the 268,000 acres of nonirrigable reservation land.[8] Though some of the consideration may have flowed directly to the individual Indians, *i.e.,* the $300 for each family head and the allotments as provided in the 1902 Act, the irrigation system itself which would serve all of the irrigable land held by the allottees passed to the Tribe.

■ In agreeing to exchange with the beneficial owner of the land, the Tribe,[9]

8. Further support for the court's conclusion that any obligation or consideration to the Pah Ute Indians actually flowed to the Tribe can be found in the general rule that reference to the word "Indians" in the 1902 Act and 1906 Agreement is generally considered a reference to the Tribe of Pah Ute Indians. *Wilson v. Omaha Indian Tribe,* 442 U.S. 653, 665, 99 S.Ct. 2529, 2536, 61 L.Ed.2d 153 (1979). *See also generally Morton v. Mancari,* 417 U.S. 535, 551–55, 94 S.Ct. 2474, 2483–85, 41 L.Ed.2d 290 (1974).

In addition, the court notes that any doubtful expressions in statutes passed for the benefit of groups of Indians are to be liberally construed in favor of the Indians as a Tribe. *Wilson v. Omaha Indian Tribe, supra,* 442 U.S. at 662, 99

S.Ct. at 2535 and cases cited therein. The court construes that general rule as requiring a reading in this case of the 1902 Act and 1906 Agreement such that defendant's obligation in the 1902 Act and the consideration in the 1906 Agreement flows to the Tribe (plaintiff).

9. As the court stated earlier (*see supra* note 8), references to "Indians" are usually construed as references to a Tribe. *See Wilson v. Omaha Indian Tribe,* 442 U.S. 653, 665, 99 S.Ct. 2529, 2536, 61 L.Ed.2d 153 (1979). Under this rule the 1902 Act and 1906 Agreement can be construed as dealing with the Tribe. There is evidence in the documents, which pre-dated the 1906 Agreement, submitted by plaintiff, that both State and Federal officials who met with

certain benefits for the Tribe's members, including an irrigation system in exchange for the Tribe's land, defendant did by its own acts undertake a special duty or obligation to the Tribe. Such an obligation to the Tribe makes this claim a tribal claim. This satisfies the first criterion for establishing a breach of fair and honorable dealings as set out in *Aleut Community of St. Paul Island v. United States, supra,* 202 Ct.Cl. at 196, 480 F.2d at 839. *See also Fort Sill Apache Tribe v. United States, supra,* 201 Ct.Cl. at 640, 477 F.2d at 1365.

Further support for the court's conclusion that this is a tribal claim can be found in *United States v. Creek Nation,* 201 Ct.Cl. 386, 476 F.2d 1290 (1973). In *Creek Nation,* the plaintiff Tribe ceded 5,200,000 acres of land to the government pursuant to a treaty. The principal consideration for this cession was 2,187,200 acres of the same land being reserved from the cession for the use by and promised fee title possession (or value thereof) for individual Creek chiefs and family heads. *Id.* 201 Ct.Cl. at 388, 476 F.2d at 1291. The plaintiff claimed it received insufficient consideration for its 5,200,000 acres of land under the treaty, because most of the individual Creeks were unable to acquire patents on the reserved 2,187,200 acres of land, and requested damages equaling the fair market value of the full 5,200,000 acres. The defendant did not object to paying the difference between the treaty consideration and the fair market value of the 3,012,800 acres (5,200,000 minus 2,187,200) not returned to individual Creeks. However, defendant objected to and appealed the Indian Claims Commission's order (26 Ind.Cl. Comm. 410 (1971)) requiring it to pay the fair market value for the lands given to individual Creeks. One of the primary issues which was addressed by the Court of Claims in that case was whether the claim for compensation for the 2,187,200 acres held by individual Creeks was a tribal claim

or a composite of individual Indians' claims. *Id.* 201 Ct.Cl. at 389, 476 F.2d at 1291–92.

In discussing whether the claim in the *Creek Nation* case was tribal in nature the court stated: "[W]e hold that under the facts and circumstances of this case where the *whole* individual-reserves scheme constituted unconscionable treaty consideration [because it should have been known that patents were not likely to vest in the individual Creeks], the tribe can present a valid claim under the Indian Claims Commission Act." *Id.* 201 Ct.Cl. at 409, 476 F.2d at 1304. The court noted that the Creeks were neither seeking compensation for frauds committed against them individually nor claiming damages for individual losses. Instead, quoting the Indian Claims Commission, the court wrote:

> The rights which have been allegedly violated are those of the tribe. *The 5,200,000 acres was tribal property.* The treaty by which it was ceded to the United States was negotiated by representatives of the tribe on behalf of the tribe. Although rights of individuals may also have been violated the wrongdoings complained of were only to the tribe. 26 Ind.Cl.Comm. at 434 [*Id.,* 201 Ct.Cl. at 409–10, 476 F.2d at 1304] [emphasis added].

Plaintiff, in this case, like the Creek Nation above, ceded its tribal land to the government. Though there has been no allegation of unconscionable consideration in this case, plaintiff's claim is analogous, in that it is essentially claiming failure of consideration in exchange for its ceded land.

Defendant attempts to distinguish this case from *United States v. Creek Nation, supra,* by arguing that the land ceded by the Creek Nation including the acreage which went to individual Creeks, was tribal land whereas the 10,000 acres of irrigable land on the Walker River Reservation had been allotted prior to the 1906 Agreement and thus was no longer Tribal land at the time of the 1906 cession. *United States v.*

---

the Indians on the Walker River Reservation dealt with individuals who the officials referred to as chiefs, captains or headmen of the Tribe. This evidence indicates that there was in fact a

Tribe and tribal hierarchy that the government could and did deal with in setting up the allotments and arranging the cession of reservation lands.

*Arenas,* 158 F.2d 730, 749–50 (9th Cir. 1946), *cert. denied,* 331 U.S. 842, 67 S.Ct. 1531, 91 L.Ed. 1853 (1947); *First Nat'l Bank of Decatur, Neb. v. United States,* 59 F.2d 367, 369 (8th Cir.1932). Even assuming that defendant's factual and legal assertions regarding this issue are true, the court finds defendant's argument unpersuasive. The Creek Nation ceded 5,200,000 acres of land it owned. The Creek Nation brought a claim based on unconscionable consideration for this land it ceded. Plaintiff in this case ceded 268,000 acres of land it owned. Plaintiff's claim in this case is that defendant failed to provide the Tribe with the consideration it had promised the Tribe for the 268,000 acres. The 10,000 acres are not at issue. Therefore, defendant's attempt to distinguish *United States v. Creek Nation, supra,* must be rejected.

Defendant also argues that the case of *Sac and Fox Tribe v. United States,* 9 Ind.Cl.Comm. 301 (1961), *aff'd,* 159 Ct.Cl. 247 (1962), *cert. denied,* 375 U.S. 921, 84 S.Ct. 266, 11 L.Ed.2d 165 (1963) controls in this case and establishes that plaintiff's claim is not tribal in nature. In *Sac and Fox Tribe,* pursuant to a treaty, the Sac and Fox Tribe ceded a very large area of land in exchange for a relatively small sum of money and a small tract of land to be used by the half-breeds of the Sac and Fox Tribe. The defendant subsequently failed to survey the half-breed tract and determine the eligible claimants to that land, as the plaintiff claimed defendant was obligated to do, all to the injury of the Tribe. 9 Ind.Cl.Comm. at 313.

The Indian Claims Commission found that the Tribe was not asserting a tribal claim on a tract of land which it no longer owned. It stated: "[T]he United States created the half-breed tract at the behest of the Sac and Fox nation, not for the tribe's benefit or the Government's benefit, but for the sole benefit of the Sac and Fox half breeds." *Id.,* 9 Ind.Cl.Comm. at 313 (as quoted in *Sac and Fox Tribe v. United States, supra,* 159 Ct.Cl. at 254. The Commission concluded:

Royce Area 120 was created for the direct benefit of the Sac and Fox half breeds, and for them alone. Any failure on the part of the defendant to survey the tract and determine the rightful claimants (assuming there was such an obligation), was of genuine concern to the half breeds and worked an injury upon them and not upon the tribe. Any potential damage suits inured to the benefit of individual half breed owners and claimants. Even assuming the capacity of the petitioners herein to present the accumulated grievances of all the Sac and Fox half breeds with respect to subject tract, this fact alone does not convert a collection of individual claims into a tribal interest cognizable within the meaning of the Indian Claims Commission Act. [*Id.,* 9 Ind.Cl.Comm. at 314] [footnote omitted].

The Court of Claims concurred in this conclusion. *Sac and Fox Tribe v. United States, supra,* 159 Ct.Cl. at 254 n. 11.

Defendant reads the *Sac and Fox Tribe* decision as standing for the proposition that if individual Indians are the third-party beneficiaries of a "contractual obligation" to the Tribe then any attempt to enforce that contractual obligation is a claim of the individual Indian beneficiaries and not the Tribe itself. Defendant contends that the irrigation system in this case is analogous to the half-breed tract consideration for the cession of tribal lands in *Sac and Fox Tribe.* Based on this contention, defendant asserts that any obligation it may have had to provide the Tribe with an irrigation system was essentially for the benefit of the individual Indian allottees and thus this claim is in reality a collection of individual claims outside this court's jurisdiction. *See also Sioux Tribe v. United States,* 89 Ct.Cl. 31 (1939).

The court, however, concludes that *Sac and Fox Tribe v. United States, supra,* is distinguishable from the case at bar. First, the court finds that the irrigation system in this case which defendant was obligated to provide was for the Tribe's benefit and not for the benefit of a small

portion of the Pah Ute Indian Tribe.[10] The court concludes that the irrigation system itself would have become a communal tribal asset [11] which could be used by the individual Indians. Such an asset was for the benefit of the Tribe.[12] The half-breed tract in *Sac and Fox Tribe*, on the other hand, was totally divorced from the Tribe and no longer capable of being considered tribal property.

Another point which distinguishes this case from *Sac and Fox Tribe v. United States, supra*, is the nature of the claim asserted in each case. In *Sac and Fox Tribe*, the Tribe filed a claim based on defendant's failure to survey the half-breed tract and to determine the rightful claimants to that land. That claim concerned land no longer owned by the Tribe and injuries suffered strictly by individuals. In this case, however, the Tribe has filed a claim essentially for failure of consideration in exchange for its land. Such a claim is clearly distinguishable and has been recognized as a tribal claim in the analogous case of *United States v. Creek Nation, supra*. Therefore, the court concludes that *Sac and Fox Tribe* is not controlling in this case.

Plaintiff's counsel at oral argument brought another case to the court's attention regarding the issue of whether a tribal claim exists in this case. That case is *Pueblo of Isleta v. Universal Constructors, Inc.*, 570 F.2d 300 (10th Cir.1978) where the Tenth Circuit found that the tribe could bring a claim on behalf of individual Indians whose property was injured due to the blasting of the defendant because the court found that the tribe had a reversionary interest in the same property. Though the facts in *Pueblo of Isleta* are distinguishable from those in the case at bar, the court finds that the decision generally supports the court's finding that plaintiff's claim in this case is tribal in nature.

To counter plaintiff's introduction of *Pueblo of Isleta v. Universal Constructors, Inc., supra*, at oral argument defendant's counsel asserted that *Assiniboine & Sioux Tribes v. Montana*, 568 F.Supp. 269 (D.Mont.1983) supports defendant's view that plaintiff's claim is not a tribal one. In *Assiniboine & Sioux Tribes*, the district court rejected the plaintiff tribe's position that it could bring tax refund claims on behalf of individual Indians based on the *parens patriae* doctrine. *Id.* 568 F.Supp.

**10.** In *Sac and Fox Tribe v. United States*, 9 Ind.Cl.Comm. 301 (1961), *aff'd*, 159 Ct.Cl. 247 (1962), *cert. denied*, 375 U.S. 921, 84 S.Ct. 266, 11 L.Ed.2d 165 (1963), there were only 38 half-breeds out of the entire Sac and Fox Tribe eligible to own land on the half-breed tract. 9 Ind.Cl.Comm. at 311. However, in this case all the Indians belonging to the Walker River Reservation were entitled to the benefits of the irrigation system. The Indian Reorganization Act of June 18, 1934, 48 Stat. 987, 988, 25 U.S.C. § 476 at least implicitly considered the groups of Indians living on the various reservations to be tribal entities.

**11.** The irrigation system at issue would have become a communal asset utilized by all the members of the Tribe. Though the irrigation system may have been constructed and maintained by the government, if any disputes between individual Indians arose regarding the irrigation system, presumably, as a practical matter, the Tribe would settle such disputes. This would make the irrigation system an asset of the nature of communal Indian property, the title to which resides in the Tribe and not the individual members. F. Cohen, *supra*, at 610. The title to such property remains in the Tribe even though used by individual members. *Id.* at

609. *See generally Whitefoot v. United States*, 155 Ct.Cl. 127, 293 F.2d 658 (1961), *cert. denied*, 369 U.S. 818, 82 S.Ct. 829, 7 L.Ed.2d 784 (1962). Given this rule, it is only reasonable to conclude that the irrigation system was part of the consideration which flowed to the Tribe in exchange for its cession of a substantial portion of its reservation lands because the irrigation system was an asset which was communal in nature.

**12.** If defendant's argument was taken to its logical conclusion, there would be no such thing as a tribal claim regarding tribal property. The rule is that "[w]hatever title the Indians have is in the tribe, and not in the individuals, *although held by the tribe for the common use and equal benefit of all members.*" *Cherokee Nation v. Hitchcock*, 187 U.S. 294, 307, 23 S.Ct. 115, 120, 47 L.Ed. 183 (1902) (emphasis added). If all tribal land is actually held for the equal benefit of all individual tribal members then under defendant's theory all claims regarding defendant's obligations as to tribal property would be those of the individual Indians and not the Tribe's. Such a rule is both contrary to reason and the law.

at 277. In addressing defendant's reliance on *Assiniboine & Sioux Tribes*, the court notes that the Tenth Circuit specifically refused to decide whether the Tribe in *Pueblo of Isleta v. Universal Contractors, Inc., supra,* could have successfully brought its action based on its *parens patriae* relationship to its members. *Id.* 570 F.2d at 302 n. 2. The court also notes that the district court in *Assiniboine & Sioux Tribes v. Montana, supra,* in addressing the plaintiff's *parens patriae* jurisdictional theory stated: "The court is convinced, however, that the entity purporting to advance the claim must be acting on behalf of the collective interests of *all* its citizens." *Id.* 568 F.Supp. at 277 (citing *Louisiana v. Texas,* 176 U.S. 1, 19, 20 S.Ct. 251, 257, 44 L.Ed. 347 (1900) (emphasis in original). The tax refund claim being asserted by the tribe in that case on behalf of its members was only for a limited number of Indians. However, plaintiff's claim in the case at bar is essentially on behalf of all the tribal members and thus, if anything, the ruling in *Assiniboine & Sioux Tribes* supports this court's finding of a tribal claim in this case.

Defendant disagrees with any assertion that the irrigation system at issue would in fact have been owned by the Tribe. Defendant implicitly argues that if the Tribe had no property interest in the irrigation system then: (1) the individual Indian allottees may be considered the primary beneficiaries of defendant's obligation to supply the irrigation system and thus this claim is really that of the individual Indians, and/or (2) the Tribe suffered no damages which is the third required criterion of a breach of fair and honorable dealings. *Aleut Community of St. Paul Island v. United States, supra,* 202 Ct.Cl. at 196, 480 F.2d at 839. If the Tribe was not damaged, then its claim is not cognizable in this court. *See e.g., Bay Mills Indian Community v.*

*United States,* 35 Ind.Cl.Comm. 32, 49–50 (1974). The court, however, is persuaded that the legal niceties of ownership are not controlling in this case and that plaintiff had a compensable interest in the irrigation system which defendant failed to provide. *See* F. Cohen, *supra,* at 472, 605–06.

Defendant argues that it and not the Tribe owned the portion of the irrigation system actually installed and would have owned the entire project when and if it was constructed. *See United States v. Morrison,* 203 F. 364, 365 (C.C.D.Colo.1901). Defendant asserts that its control over Indian irrigation projects in general indicates its ownership of such systems. Defendant also cites legislative history which refers to certain Indian irrigation projects as "Federal projects". *See* H.R.Rep. No. 2130, 70th Cong., 2d Sess. 2 (1929). Defendant also points out the purchasers of some of the allotted land on the Walker River Reservation were required to reimburse the government for accrued construction, operation, and maintenance costs of the irrigation system. Defendant argues that if plaintiff had owned the system it would have been reimbursed for these costs. Defendant essentially contends that it only agreed to provide plaintiff with the *service* of providing irrigation water in exchange for the cession of its lands and that it never agreed to give plaintiff the system.

■ Whether plaintiff had legal title, in the strict sense, to the irrigation system is not controlling in this Indian case. The court views the irrigation system at issue as analogous to any other natural resources found on a reservation. *See generally,* F. Cohen, *supra,* at 728–36. It is the general rule that legal title to an Indian reservation is held by the United States in trust for the Tribe.[13] The Tribe is the beneficial owner of the reservation. *See*

---

**13.** "While title to most tribal land is held by the United States in trust, tribes such as the Pueblos of New Mexico and the Tuscarora of New York hold fee title to their land. In both instances, however, the tribe may not convey without the consent of the United States." D. Getches, D. Rosenfelt & C. Wilkinson, *Federal Indian Law,*

542 n. 2 (1979). There is no indication in this case that plaintiff had such a fee title to its reservation lands. However, the taking of plaintiff's land of which it was the beneficial owner is compensable. *See Three Tribes of Fort Berthold Reservation v. United States,* 182 Ct.Cl. 543, 561–63, 390 F.2d 686, 696–97 (1968).

*United States v. Shoshone Tribe of Indians*, 304 U.S. 111, 115–16, 58 S.Ct. 794, 797–98, 82 L.Ed. 1213 (1938). *See also United States v. Algoma Lumber Co.*, 305 U.S. 415, 420–21, 59 S.Ct. 267, 270–71, 83 L.Ed. 260 (1939); *Navajo Tribe of Indians v. United States*, 176 Ct.Cl. 502, 550–51, n. 2, 364 F.2d 320, 322–23, n. 2 (1966); United States Department of the Interior, *Federal Indian Law*, 20 (1958). The natural resources on the reservation, like the reservation itself, are held in trust by the government for the Tribe and the Tribe is the beneficial owner of these natural resources. *See United States v. Shoshone Tribe of Indians, supra*, 304 U.S. at 116–18, 58 S.Ct. at 797–98. *See also* D. Getches, D. Rosenfelt & C. Wilkinson, *Federal Indian Law*, 542 n. 1 (1979). Such a relationship between plaintiff and defendant regarding the natural resources on the reservation placed certain responsibilities on defendant to control and supervise the resources including the irrigation system. *See Navajo Tribe of Indians v. United States*, 224 Ct.Cl. 171, 186–87, 624 F.2d 981, 988–89 (1980); *Navajo Tribe of Indians v. United States*, 176 Ct.Cl. 502, 506, 364 F.2d 320, 322 (1966). Given these rules, the court concludes that plaintiff was at least the beneficial owner of the irrigation system and any control over that system by defendant [14] did not diminish that ownership interest. *See United States v. Algoma Lumber Co., supra*, 305 U.S. at 420–21, 59 S.Ct. at 270–71.

Defendant's counsel at oral argument placed a great deal of reliance upon *United States v. Morrison, supra*, in support of defendant's position that it owns or would have owned the irrigation system at issue. The court finds *Morrison* unpersuasive in that regard. The court does not read *Morrison* as stating that defendant owned the irrigation system at issue in that case. The defendant, Morrison, may have alleged that the government owned the irrigation system, but the court reads the *Morrison* decision as standing for the proposition that if defendant supplies the Indians with an irrigation project it has a duty to preserve that system for the benefit of the Indians. *See also United States v. Walker River Irrigation Dist., supra*. Therefore, the tenor of *United States v. Morrison, supra*, supports this court's position that plaintiff is at least the beneficial owner of any irrigation system on the reservation even though legal title thereto *may* be held by defendant.

In any event, whatever ownership interest plaintiff may have in the irrigation system it is clear to the court that it is a compensable interest. As the court stated earlier, the 268,000 acres ceded to the government was tribal property which could not be conveyed by the individual tribal members. *See* F. Cohen, *supra*, at 605–06. In exchange for ceding this land to defendant, plaintiff was to receive an irrigation system capable of irrigating 10,000 acres of allotted land. Under these

---

**14.** Felix Cohen recounted a portion of the history of Indian irrigation projects in his treatise on Federal Indian Law. He wrote:

"Evidence of ancient irrigation works abounds in the more arid regions of western part of the United States, indicating that irrigation was practiced by the Indian in prehistoric times. Without irrigation, much of this land is unproductive and unsuited to human life. When Indian reservations were established in this country, the Federal Government, in order to make it possible for the Indian to become self-supporting, embarked on a program of irrigation development." (F. Cohen, *Federal Indian Law*, 248 (1942 ed.) (footnotes omitted).

Cohen noted the role the Federal Government played in constructing and maintaining the irrigation systems.

He recounted:

"Until 1902 irrigation construction, maintenance, and operation were carried on under the direction of the reservation superintendents, with occasional assistance from local engineers temporarily employed.

"In 1906, a chief engineer was appointed and gradually since that time a technical staff and organization has been developed to supervise and carry on Indian irrigation.

"In addition to construction, operation and maintenance of systems of canals and ditches, the Indian irrigation service has supervised the construction and operation and maintenance of numerous drainage systems, pumping plants, storage and flood control dams, and miscellaneous irrigation developments in connection with subsistence gardens or homesteads." (*Id.*) (footnotes omitted).

circumstances the court finds plaintiff has a compensable interest in the irrigation system.

In an analogous case involving timber lands and the plaintiff Tribe's interest therein the Court of Claims stated:

> In determining the character and nature of the Indian interest in land created as a reservation, the circumstances surrounding the creation of that reservation, especially where the Executive order language is cryptic, should not be disregarded. The totality of the circumstances surrounding the creation of the timber reservation in 1864 clearly show that it was created to meet the timber needs of the Pyramid Lake Indian Reservation with the objectives of keeping the Indians on this Reservation, making them self-sufficient, and providing them with the materials to become civilized. This purpose and these objectives are clearly compatible with the conclusion that the 1864 Executive order conveyed to plaintiff a compensable interest in the timber reservation. *See United States v. Walker River Irr. Dist., supra,* 104 F.2d at 336. [*Northern Paiute Nation v. United States,* 225 Ct.Cl. 275, 292, 634 F.2d 594, 604 (1980).]

In *Northern Paiute Nation v. United States, supra,* the issue was whether timber land given to the Indians on the Pyramid Lake Reservation could be taken from the Indians by subsequent Executive order without compensation. The court concluded that said timber land could not be taken without compensation.

The court, in *Northern Paiute Nation,* found that the government placed the Indians on the Pyramid Lake Reservation and induced them to cease their nomadic way of life by agreeing to provide them with the necessary materials and assistance to become self-sustaining and civilized. *Id.* 225 Ct.Cl. at 294, 634 F.2d at 605. The materials promised included timber land and a saw mill and the promised assistance was governmental aid in running the saw mill. The court went on to state:

> It is not unreasonable to believe that the Indians understood that this plan was part of the *quid pro quo, i.e.,* acceptance of reservation life in return for assistance in civilized and self-sufficiency development. *See Choctaw Nation v. United States,* 318 U.S. 423, 432, 63 S.Ct. 672, 678, 87 L.Ed. 877 (1943). Under such circumstances, a special relationship was created by the 1864 Executive order, implementing this plan, between the federal government and the plaintiff. This special relationship and attendant governmental duty are sufficient to support a claim under the "fair and honorable dealings" provision, section 2, subsection (5), of the Indian Claims Commission Act. *See Gila River Community v. United States,* 190 Ct.Cl. 790, 794–801, 427 F.2d 1194, 1196–1200, *cert. denied,* 400 U.S. 819, 91 S.Ct. 37, 27 L.Ed.2d 47 (1970). Plaintiff premises its entitlement to compensation on subsection (5), as well as subsection (1) of that Act. [*Id.* 225 Ct.Cl. at 294, 634 F.2d at 605.]

The circumstances surrounding the promised creation of the irrigation system in this case similarly indicate that plaintiff has a compensable interest in the irrigation system. The system was to be in consideration for plaintiff ceding 268,000 acres of its reservation land. The overall objective of the government was to turn the Pah Ute Indians into farmers, keeping them on the reservation and making them self-sufficient. The Pah Ute Indians could not achieve those goals on its arid reservation lands without an irrigation system. It appears that a *quid pro quo* arrangement existed, *i.e.,* an exchange of tribal lands for an irrigation system and an opportunity to become farmers. As the court found in *Northern Paiute Nation v. United States, supra,* such an arrangement created a tribal compensable interest in the irrigation system.

■ Further support for this finding of a tribal compensable interest in the irrigation system can be found in the rule that "[d]ocuments setting aside land [or other assets] for the use and benefit of Indians

have uniformly been given a liberal interpretation favorable to the Indians." *Id.*, 225 Ct.Cl. at 292, 634 F.2d at 604. (citations omitted). Whatever conflicting inferences or legal niceties may exist in this case as to the status of the irrigation system when defendant became obligated to provide it under the 1902 Act and 1906 Agreement, that which makes it possible to find that the irrigation system was set aside for the use of the Pah Ute Indians so as to create a compensable interest in said system is of greater force than any implication or inference that all defendant agreed to provide in exchange for the cession of tribal lands was the service of providing water. *Id.* (citing *Winters v. United States*, 207 U.S. 564, 576, 28 S.Ct. 207, 211, 52 L.Ed. 340 (1908)). "Any doubts as to the scope of the interest conferred on plaintiff * * * are to be resolved in favor of the Indian wards as against the guardian United States." *Northern Paiute Nation v. United States, supra,* 225 Ct.Cl. at 292, 634 F.2d at 604.[15]

Having found that the Tribe has at least a compensable interest in the irrigation system the court returns to the criteria for a claim of a breach of fair and honorable dealings as set out in *Aleut Community of*

*St. Paul Island v. United States, supra,* 202 Ct.Cl. at 196, 480 F.2d at 839. First, the court has concluded that defendant through the Act of May 27, 1902 and Agreement of June 20, 1906, undertook an obligation to the Tribe of Pah Ute Indians. Second, there is no real dispute that defendant has failed to fulfill its obligation of providing the Tribe with an irrigation system capable of irrigating the 10,000 acres of allotted land. And third, due to the Tribe's compensable interest in the irrigation system, the court concludes that plaintiff was damaged by defendant's failure to construct the irrigation system it undertook a special duty to provide. Therefore, the court concludes that plaintiff's claim is a tribal claim within the "fair and honorable dealings" clause of 25 U.S.C. § 70a which is within this court's jurisdiction. *See id.,* 202 Ct.Cl. at 196, 480 F.2d at 839.

Since the court has concluded that plaintiff's claim is a distinct tribal claim within the intendment of *Fort Sill Apache Tribe v. United States, supra,* 201 Ct.Cl. at 635–40, 477 F.2d at 1362–65, and since there is no dispute that defendant in fact has failed to fulfill its obligation to the tribe to provide an irrigation system capable of irrigating the allotted acreage of irrigable land,

15. Essentially what defendant is attempting to do in this case is to acquire 268,000 acres of tribal land without ever providing the Tribe with any consideration therefor. Defendant argues that the irrigation system was really for the benefit of the individual tribal members and not for the Tribe. The practical effect of the court so ruling would be that the Tribe could not recover on its claim and the individual Indians' claims would either be barred by the statute of limitations or the Indians would never bring such claims. Defendant has lost sight of the fact that Tribes bring all of their suits on behalf of their members. Attempting to use legal niceties regarding the ownership of the irrigation system or third party beneficiary theories to eliminate the Tribal claim will have its greatest impact on those individuals the government asserts should be bringing the claims in this case. Such a position runs head-on into the principle of resolving such questions in favor of the Indians (*Northern Paiute Nation v. United States, supra,* 225 Ct.Cl. at 292, 634 F.2d at 604) and has been rejected essentially by the Tenth Circuit Court of Appeals in *Pueblo of Isleta v. Universal Constructors, Inc.,* 570 F.2d 300, 302 (10th Cir. 1978).

Defendant's counsel also alleged at oral argument that plaintiff received back from defendant more than the 268,000 acres of land plaintiff ceded to the government in 1906. Defendant's counsel implied that such an alleged receipt of more land than plaintiff originally ceded (though not necessarily the same land) may extinguish any claim the tribe might have had based on failure of consideration. The court is not persuaded that defendant's obligation to provide the tribe with an irrigation system was terminated by the alleged fact that the tribe subsequently received additional reservation land under totally unrelated circumstances. *Cf. Sioux Nation of Indians v. United States,* 220 Ct.Cl. 442, 462, 601 F.2d 1157, 1168–69 (1979), *cert. denied, Yankton Sioux Tribe v. United States,* 446 U.S. 953, 100 S.Ct. 2920, 64 L.Ed.2d 810 (1980). Furthermore, defendant's counsel was unable to demonstrate to the court whether plaintiff was required to give anything up in exchange for the additional acreage it received which would weigh against defendant's implied theory.

the only remaining issue to be resolved is the measure of damage.[16]

## III.

Based upon the above discussion, the court concludes that defendant's motion for summary judgment is denied. The parties are directed to advise the court whether, in light of this opinion, the water and irrigation claims of the Walker River Tribe have a probability of settlement. If there is no probability of settlement, the parties are to advise when they will be ready for trial on these claims. Such a status report shall be filed with the court by the parties, after consultation with each other, within sixty (60) days from the date of this opinion.

---

**16.** The parties have intimated to the court during informal generalized discussions that, once the court resolved this jurisdictional question, the likelihood of settlement regarding the damages aspect of the total water claim of the Walker River Tribe in this case was probable. The court believes that this is a claim which should be settled and urges the parties to work toward that end. The court notes that in a situation similar to the one in this case another Northern Paiute Nation Tribe was able to settle remaining disputes it had with defendant after the Court of Claims issued a decision on a pivotal preliminary issue. *See Northern Paiute Nation v. United States,* 225 Ct.Cl. 275, 634 F.2d 594 (1980). The court hopes that the parties will be able to resolve, in a similar manner, any further differences they may have in the case of the Walker River Tribe. Indian litigation surely must come to an end at some point in this century.

With regard to the damages emanating from plaintiff's claim at bar, the court deems it prudent to make a few brief comments thereon. Plaintiff's claim is for injuries suffered by the Tribe as a result of defendant's failure to provide it with an irrigation system capable of irrigating approximately 10,000 acres. Having reviewed all of the documentation submitted by plaintiff, the court finds that the estimated costs of such an irrigation system in the early 1900's ranged from $10,000 to $15,000 for a reservoir and ditch system capable of irrigating a total of 10,000 acres up to $50,000 for a system capable of only irrigating 5,000 acres. In July 1906, authorization was given by the Assistant Secretary of Interior to extend Ditch No. 2 on the reservation at a cost not to exceed $50,000. The Annual Report of the Department of Interior for 1901, House Doc. No. 5, 57th Cong., 1st Sess. suggests that $134,000 would be ample to provide storage water and irrigation ditches by selling the non-irrigation land at 50 cents an acre (.50 × 268,000 acres).

In a February 1972 Report, known as the Walker River Rehabilitation and Betterment Report, prepared by the Nevada Indian Agency at the request of the Walker River Paiute Tribal Council and transmitted to the Bureau of Indian Affairs, Department of Interior, it was estimated that $1,080,000 would be required to make certain improvements on the Walker River Irriga-tion System embracing a 4-year construction schedule. The Report, noting that the existing irrigation system served 2,750 acres, advised its suggested project would extend the irrigation system to serve an additional 2,750 acres. The Report also entailed making major repairs on Weber Dam, repairs on 17.23 miles of canals and 13.51 miles of laterals and construction of 16.87 miles of new laterals, and new construction of some 400 water control structures. The goal of the program was to develop the irrigation system so each 20-acre allotment could be delivered an irrigation head of approximately 6 to 10 cubic feet per second of water. After this discussion of potential measures of damages, the court does note that it appears that damages should be valued as of the date when defendant's breach of its obligation occurred. *See* F. Cohen, *supra,* at 569. *See also Kiowa, Comanche and Apache Tribes v. United States,* 143 Ct.Cl. 534, 541–42, 163 F.Supp. 603, 608–09 (1958). Based on the facts submitted in this case, the court believes that defendant should have been able to provide plaintiff with an adequate irrigation system within a reasonable time after 1906 and thus that is the time period in which defendant's breach occurred.

The court also notes that, since this claim relating to the irrigation system is not grounded on a constitutional fifth amendment taking theory, plaintiff would not be entitled to interest on any damages due it as a result of defendant's failure to provide the irrigation system. *See Northern Paiute Nation v. United States, supra,* 225 Ct.Cl. at 297 n. 20, 634 F.2d at 607 n. 20. *See also generally Mitchell v. United States,* 229 Ct.Cl. 1, 16, 664 F.2d 265, 275 (1981), *aff'd,* 463 U.S. 206, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983); *United States v. Mescalero Apache Tribe,* 207 Ct.Cl. 369, 392, 518 F.2d 1309, 1323 (1975), *cert. denied,* 425 U.S. 911, 96 S.Ct. 1506, 47 L.Ed.2d 761 (1976). In addition, "[i]f the claim is predicated upon inadequate contractual consideration [similar to plaintiff's theory in this case] * * * no interest is due on any additional sum awarded to the tribe in excess of the agreed-upon compensation." F. Cohen, *supra,* at 570. *See Nez Perce Tribe v. United States,* 176 Ct.Cl. 815, 829–30 (1966), *cert. denied,* 386 U.S. 984, 87 S.Ct. 1285, 18 L.Ed.2d 233 (1967).