570 F.2d 300
 PUEBLO OF ISLETA ex rel. Alvino LUCERO, Governor, Plaintiff-Appellant,
v.
UNIVERSAL CONSTRUCTORS, INC., a New Mexico Corporation, and
Wylie Bros. Contracting Company, a New Mexico
Corporation, Defendants-Appellees.
 No. 76-1686.
 United States Court of Appeals,
Tenth Circuit.
 Submitted Nov. 17, 1977.
Decided Jan. 17, 1978.
 
 L. Lamar Parrish and Calvin Hyer, Jr. of Ussery, Burciaga & Parrish, Albuquerque, N. M., for plaintiff-appellant.
 Thomas L. Johnson of Modrall, Sperling, Roehl, Harris & Sisk, Albuquerque, N. M. (Kenneth L. Harrigan and Judy A. Fry of Modrall, Sperling, Roehl, Harris & Sisk, Albuguerque, N. M., on the brief), for defendants-appellees.
 Before McWILLIAMS and DOYLE, Circuit Judges, and ROGERS, District Judge.*
 WILLIAM E. DOYLE, Circuit Judge.
 
 
 1
 The issue in this case is whether there exists subject matter jurisdiction pursuant to 28 U.S.C. § 1362. The Pueblo of Isleta brought the action to recover damages for injury to property within the boundaries of the Pueblo. The property damage was allegedly caused by blasting operations on the part of the Universal Constructors, Inc. The blasting itself was carried out beyond the boundaries of the Pueblo.
 
 The cited statute provides:
 
 2
 The district courts shall have original jurisdiction of all civil actions, brought by any Indian tribe or band with a governing body duly recognized by the Secretary of the Interior, wherein the matter in controversy arises under the Constitution, laws, or treaties of the United States.
 
 
 3
 Unquestionably, the Pueblo of Isleta is an Indian tribe or band within the meaning of the statute. However, the trial judge ruled that the property rights of the Tribe were not involved; that it was the individual Indians who were affected. He reasoned that they were in effect owners in fee simple of the property which was damaged, and that since the statute does not authorize individual Indians to sue, the action could not be maintained on their behalf by the Tribe. This ruling was made in the course of a hearing held on the issue of jurisdiction alone. At that hearing it was developed that the Pueblo is located on Indian Trust Land, the title to which is held by the United States for the Pueblo as a whole. None of the lands have been allotted to the individual Indians. Furthermore, alienation is restricted. Acting through its Governor and Council, the Pueblo allows individuals to acquire certain rights of occupation on the land of the Pueblo. This is by unwritten and unrecorded assignments from the council. Such assignments are for a limited purpose such as building a residence. The building, financing and maintaining of the residence then becomes the responsibility of the person or persons to whom the property has been assigned. He may, in turn, sell, lease or rent the residence to other members of the Pueblo with the approval of the tribal government, although the power to make assignments remains in the Pueblo. There is no evidence presented that such permission had been withheld. In accordance with the Pueblo customs, there can be inheritance. In the event that the Council revokes an assignment and reoccupies the land, the improvements would become the Tribe's property, according to the trial judge. Again, there was no evidence that this had ever been carried out.
 
 
 4
 The court pointed out that the Tribe had restricted its claims to damages to some 30 private residences on the Pueblo. It also rested its decision on the fact that repairs had been made by individual occupants and that the Pueblo government denied any obligation to make these repairs.
 
 
 5
 The court continued: "At Isleta the use and occupancy rights have numerous attributes of the fee simple leaving the Tribe with only reversionary-type interest in the land." Further, the court said that the Tribe's only interest in the improvements was "Merely an expectancy of possession in the future either by revoking the assignment of the land or by the equivalent of an escheat." It was on these bases that the court concluded that the Tribe was merely seeking to protect the rights of individual owners of the 30 private residences.
 
 
 6
 The Tribe alleged damages to the lands as well as the improvements, but at trial did not claim these damages. The Tribe did introduce evidence of some damage to wells, although these wells were apparently for the personal use of the occupants of the houses.[1]
 
 
 7
 A relatively recent decision of the Supreme Court in Oneida Indian Nation v. County of Oneida, 414 U.S. 661, 94 S.Ct. 772, 39 L.Ed.2d 73 (1974), held that the Tribe which had asserted a right to possession of certain lands which had been illegally alienated could bring an action in federal court. In upholding subject matter jurisdiction, the Supreme Court pointed to the fact that federal laws have continuously protected possessory rights to tribal lands. The Supreme Court said that a Tribe's right to invoke federal jurisdiction is not dependent on the claim of a right to possession derived from a federal grant of title. Rather, the Court continued,
 
 
 8
 * * * it rests on the not insubstantial claim that federal law now protects, and has continuously protected from the formation of the United States, possessory rights to tribal lands, wholly apart from the application of state law principles which normally and separately protect a valid right of possession.
 
 
 9
 414 U.S. at 677, 94 S.Ct. at 782. The Court then made a distinction between cases involving Indian rights to tribal lands and other cases involving merely possessory rights to lands. It ruled that the federal law protects possessory rights to tribal lands wholly apart from the application of state law principles. It thus appears that somewhat the same contentions were made in Oneida that are being urged here. Furthermore, the decision in Oneida supports the conclusion that the Pueblo in the instant case is entitled to sue in federal court.
 
 
 10
 At about the same time this court decided Mescalero Apache Tribe v. Burgett Floral Co., 503 F.2d 336 (10th Cir. 1974). In Mescalero there had been a trespass on Indian lands by certain private companies, which had engaged in arborculture and had destroyed trees. We said that the case was entirely governed by Oneida ; that there was no distinction between ejectment, which was present in Oneida, and trespass, which was present here, in terms of there being possessory rights in which the United States had an interest.
 
 
 11
 In our view, Oneida and Mescalero control the present case in that they establish that rights similar to those which are present here were also present in Oneida and Mescalero and are entitled to be protected in federal court under 28 U.S.C. § 1362.
 
 
 12
 The damage here, as in the other cases, is to tribal rights as well as individual rights. To attempt to draw a distinction based upon English common law real property concepts is not persuasive. It is true that the individuals must make the repairs. It does not follow, however, that the Tribe does not have an interest in protecting the individual occupants of the improvements and at the same time their own reversionary interests. The relationship between the Tribe and the individual members and with the United States is different from other property relationships. The United States is actually the title owner. However, it holds these properties in trust for the Tribe and, in turn, for the individual Indians. The United States also has a well-recognized interest in carrying out this protective duty. In view of this, it is not appropriate to bring into play subtle principles of English common law applicable to land titles. It would certainly be inappropriate for this court to take the kind of narrow view, which is urged, of § 1362, supra. If we were to relegate these plaintiffs to state court, as counsel for Universal Constructors, Inc. would have us do, there is no assurance that they would be allowed to assert their rights there.
 
 
 13
 The complexity of the relationship is further illustrated by the Nonintercourse Act, 25 U.S.C. § 177, and the Pueblo Lands Act, 43 Stat. 636 (1924), which prohibit alienation of any interest in Pueblo lands without the approval of the Secretary of the Interior. Thus the Pueblo itself is unable to sell or lease lands. If the present actions were brought in state courts, it would no doubt be argued that the individual Indians have merely licenses or tenancies at will and that they lack sufficient interest to maintain the case. It would seem, therefore, that the approach to the present question must not be on the basis of fine legal distinctions which are part of a system of property law which is completely alien to the plaintiff Indians. Moreover, third persons ought not be allowed to set up individual Indian rights or lack of rights for their own benefit. The Pueblo is the beneficial owner of the lands and has a reversionary interest in the improvements. Hence, it would seem that it has the requisite standing to bring a trespass action. United States v. Candelaria, 271 U.S. 432, 46 S.Ct. 561, 70 L.Ed. 1023 (1926), and Mescalero, supra. In the present action, damage to property as a result of concussions should not be distinguished because there has not been a physical invasion. Such a narrow approach to the definition of rights is also inappropriate here.[2]
 
 
 14
 In sum, the peculiarly close relationship between the Tribe and its members, together with the difficulties which individual Indians encounter in seeking to assert rights in courts, and considering also that there are some 30 occupants involved here, and considering, in addition, that the Tribe is not without property interests of its own, we are persuaded that the case is a proper one for hearing and determination in federal court. Finally, the United States has a strong interest in seeing to it that not only the Tribe but the individual members shall have even-handed justice. We must, therefore, reject the notion that common law doctrines, including concepts of fee titles, are to rule the rights which are here involved.
 
 
 15
 The trial court can fashion a method for awarding damages that are attributable to the individuals. These, for example, can be awarded to the Tribe in trust for the individual claimants.
 
 
 16
 Accordingly, the judgment of the district court is reversed and the cause is remanded for further proceedings consistent with the views expressed herein.
 
 
 
 *
 Of the District of Kansas, sitting by designation
 
 
 [1]
 Since tribal damages as shown herein make some contribution to jurisdiction of the court, these claims ought not to be discarded
 
 
 [2]
 We need not decide whether the Tribe could bring the action because of its parens patriae relationship to its members. However, the cases do tend to show the closeness of the affiliation, indeed kinship, which exists between the Tribe and its members. The Eighth Circuit noticed this in Standing Rock Sioux Indian Tribe v. Dorgan, 505 F.2d 1135 (8th Cir. 1974). The contention that the Tribe could sue on behalf of the members was there raised and the court mentioned in passing that it had recognized the standing of an organization to vindicate the rights of its members, citing NAACP v. Button, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963). See 505 F.2d at 1139, n. 9
 There are a good many cases in which the doctrine of parens patriae has been discussed in the context of protection of natural resources or preservation of land. Also, in some of them the residual interest of the state has been considered. See Hawaii v. Standard Oil Co., 405 U.S. 251, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972); Commonwealth of Pennsylvania v. National Ass'n of Flood Ins., 520 F.2d 11 (3d Cir. 1975). See also Commonwealth of Pennsylvania v. Kleppe, 174 U.S.App.D.C. 441, 533 F.2d 668 (1976), cert. denied, 429 U.S. 977, 97 S.Ct. 485, 50 L.Ed.2d 584 (1976). There are other familiar examples of a group asserting the rights of its members. In some of these the questions arises in the context of standing to sue. See Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972); Button, supra; NAACP v. Alabama ex rel. Patterson, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958). See also Note on Standing to Sue in Hart & Wechsler's The Federal Courts and The Federal System 151 (2d ed. 1973).