NORTHERN PAIUTE NATION et al.

v.

The UNITED STATES.

No. 87–A.

United States Claims Court.

Aug. 8, 1986.

## OPINION

LYDON, Judge:

In this Indian claims case, plaintiff, the Walker River Tribe (the Tribe), seeks damages to compensate it for losses resulting from the non-irrigation of certain allotted irrigable land. Plaintiff attributes the loss to the government's failure to perform an obligation to provide the Tribe with water.[1] The sole issue presently before the court is whether there exists subject matter jurisdiction in the court to decide the claim presented by the Tribe.

Defendant has moved for summary judgment, contending that the claim is an aggregation of individual Indian claims rather than a unitary tribal claim and therefore beyond this court's jurisdiction under section 2 of the Indian Claims Commission Act (the Act), 25 U.S.C. § 70a (1976). Plaintiff opposes defendant's motion and cross moves for a determination that, subject to proof, it is entitled to recover the damages sought.

The issue in this case is a close and difficult one. Upon consideration of the submissions of the parties, as well as oral argument, the court concludes, on the particular facts before it, that plaintiff's claim can reasonably be considered as setting forth a tribal claim. Accordingly, defendant's motion for summary judgment must be denied. Plaintiff's cross-motion is, however, premature and therefore must also be denied, albeit without prejudice.

### I.

The basic facts are set forth fully in a companion opinion in this case, 8 Cl.Ct. 470 (1985). Consequently, only a summary of the facts necessary to put the instant motions in perspective will be set forth here.

After the Tribe was settled on the Walker River Reservation (the Reservation) in the mid–1800's, it soon became apparent

I.S. Weissbrodt, Washington, D.C., attorney of record, for plaintiff; Abe W. Weissbrodt and Richmond F. Allan, Duncan, Weinberg & Miller, of counsel.

Daniel G. Steele, Washington, D.C., with whom was Asst. Atty. Gen. F. Henry Habicht II, attorney of record, for defendant.

---

1. The claim is but one of several claims asserted by various Tribes of the Northern Paiute Nation under the Indian Claims Commission Act. *See* *Northern Paiute Nation v. United States,* 8 Cl.Ct. 470 n. 1 (1985).

both to the government and to the Tribe that the Indians would have to rely on farming (agriculture) as a means of subsistence. However, due to the arid nature of the region encompassing the Reservation, it was clear that an irrigation system and water supply would be needed to make farming feasible to any meaningful extent. Although the Reservation lacked an abundance of water, it did contain certain mineral lands in non-farming areas that represented a potentially profitable resource. Unfortunately, it appears that the Tribe lacked the means and expertise necessary to develop the mineral resources.

In June 19, 1900, Frank M. Conser (Conser), Superintendent of Indian Schools, recommended that the rich mineral lands be sold and the proceeds therefrom used "for the construction of a storage reservoir, irrigating ditches, purchases of cattle, farm implements, etc."; in short, to get the Indians started in the business of farming.[2] Conser further recommended that 8,000–12,000 acres of potentially irrigable land be allotted, in 20–acre parcels, to the members of the Tribe. He noted, however, that allotting land would be "a useless expenditure of money" without a sufficient water supply.

Interest in the mineral lands by white men predated Conser's recommendations. In 1891, the Nevada legislature adopted a Joint Resolution calling for a reduction in the size of the Reservation. Additionally, bills designed to open up the mineral lands were introduced in the Congress. These efforts were, however, unsuccessful until government officials such as Conser proposed accompanying the reductions with the irrigation system improvements.

The proposals ultimately resulted in passage of the Act of May 27, 1902, 32 Stat.

245, 260–61, the Joint Resolution of June 19, 1902, 32 Stat. 744, and the Act of June 21, 1906, 34 Stat. 325, 358, as well as adoption of the agreement of July 20, 1906.

The pertinent text of the three Acts is set forth in the earlier opinion, 8 Cl.Ct. at 474. Essentially, these Acts established to what the Tribe was entitled in exchange for ceding the excess Reservation land to the government, which would then open the ceded land to the public. The consideration the Tribe was to receive was an irrigated allotment of 20 acres for each tribal member and $300 for each head of a family and retention of certain grazing and timber land.[3]

The agreement of July 20, 1906 formalized the Tribe's consent[4] to the exchange of a large portion of its lands for the consideration set out above. The agreement was signed by 108 Indians and recited that a majority of the 140 heads of families residing on the Reservation had, as required by the Act of May 27, 1902, consented to the allotment and relinquishment of the "excess" Reservation land. The amount of land ceded was about 268,000 acres; prior thereto, the Reservation comprised 320,000 acres. The 268,000 acres ceded included, of course, the valuable mineral lands, which were opened for entry pursuant to a proclamation of the President dated October 20, 1906.

After ceding the 268,000 acres, the Indians were left with about 51,000 acres. Of this 51,000 acres, some 10,000 were allotted, 280 reserved for agency, school and church purposes, 37,400 set aside as grazing land, and 3,300 constituted the retained timber land.

The water claim now before the court is confined to the 10,000 acres allotted to the

**2.** In his annual report to the Commissioner of Indian Affairs dated August 22, 1901, James K. Allen, Superintendent of the Indian Industrial School at Carson, Nevada and Superintendent in Charge of the Walker River agency, recommended adoption of Conser's proposal, *i.e.,* sell the mineral lands and improve the water situation.

**3.** Since the grazing and timber lands were already a part of the Reservation, it appears that the only benefit to the Tribe was the promise of irrigated allotments for its members in order to establish a Tribal agricultural economy.

**4.** The companion opinion held that the agreement was between the government and the Tribe, not the individual Indians who signed the July 20, 1906 agreement. 8 Cl.Ct. at 481.

individual Indians of the Tribe. Although the government sought to acquire water rights for these 10,000 acres, *see* 8 Cl.Ct. 478 n. 7, studied the irrigation problem and took some steps towards improving the system, *see* 8 Cl.Ct. 475–77, it is undisputed that the entire 10,000 acres were never irrigated.[5] It is this latter fact about which plaintiff complains.

## II.

■ The question now before the court is whether plaintiff is asserting a tribal claim or a mere collection of individual claims. The legal standard is clear—if plaintiff is asserting the claims of individual Indians, such claims are not cognizable under the Act and thus are beyond the subject matter jurisdiction of the court. *See Fort Sill Apache Tribe v. United States*, 201 Ct.Cl. 630, 637, 477 F.2d 1360, 1364 (1973), *cert. denied*, 416 U.S. 993, 94 S.Ct. 2406, 40 L.Ed.2d 772 (1974) (*Fort Sill Apache Tribe*); *Absentee Shawnee Tribe of Oklahoma v. United States*, 165 Ct.Cl. 510, 514 (1964) (*Absentee Shawnee Tribe*); *Cherokee Freedmen v. United States*, 161 Ct.Cl. 787, 788 (1963) (*Cherokee Freedmen*).[6] Applying that standard to the circumstances of this case is, however, a difficult endeavor.

## A.

The foundation of defendant's characterization of the claim as individual is its view of the consequences flowing from allotment of the land. Defendant contends that when tribal land is allotted, "all water use rights appurtenant thereto pass to the allottees." It has been held:

> [W]hen title passe[s] from an Indian to a nonIndian for an allotted parcel, the appurtenant right to share in tribal reserved waters passe[s] with it.

*United States v. Anderson*, 736 F.2d 1358, 1362 (9th Cir.1984). *Accord Colville Confederated Tribes v. Walton*, 647 F.2d 42, 50 (9th Cir.), *cert. denied*, 454 U.S. 1092, 102 S.Ct. 657, 70 L.Ed.2d 630 (1981); *United States v. Adair*, 723 F.2d 1394, 1417 (9th Cir.1983).

The apparent genesis of this rule is *United States v. Powers*, 305 U.S. 527, 59 S.Ct. 344, 83 L.Ed. 330 (1939) (*Powers*). *Powers* held that when tribal land is allotted, the allottees acquire "the right to use some portion of tribal waters essential for cultivation." *Id.* 532–33, 59 S.Ct. at 346–47. In discussing *Powers*, Felix Cohen, the eminent commentator on Indian law stated:

> The *Powers* case compels the view that the right to use water is a right appurtenant to the land within the reservation, and that unless excluded it passes to each grantee in subsequent conveyances of allotted land.

F. Cohen, *Handbook of Federal Indian Law* at 220 (1942 ed.) (citing *Anderson v. Spear-Morgan Livestock Co.*, 107 Mont. 18, 79 P.2d 667, 669 (1938)).

Defendant also maintains that tribal interest in reservation lands terminates upon allotment. *See, e.g., Absentee Shawnee Tribe, supra*, 165 Ct.Cl. at 517; *Donahue v. Butz*, 363 F.Supp. 1316, 1320 n. 3 (N.D. Cal.1973).

Defendant's arguments, *supra*, lead to its ultimate conclusion, *viz.*, that any wrongdoing by the government in failing to provide water to the allotted land area resulted only in injury to individual allottees rather than the Tribe. The Tribe, defendant argues, cannot sue for these individual wrongs.

For its part, plaintiff disputes each of defendant's contentions. It renews its argument made in connection with the earlier opinion, 8 Cl.Ct. 470, that the "water" cases relied upon by defendant are distin-

---

**5.** It presently appears that some 2,800 acres are irrigable by the system constructed by defendant.

**6.** While individual Indians theoretically could advance the claims if they were of an individual nature, this court noted in a prior opinion that,

as a practical matter, such individual claims would either be barred by the statute of limitations or the individual Indians would never institute suit relative to such claims. 8 Cl.Ct. 488 n. 15.

guishable and that beneficial ownership of the water would not have passed from the Tribe after allotment. Further, plaintiff maintains that the question of who, technically, would hold title to the water had the obligation been fulfilled is irrelevant to the issue of whether the Tribe can recover damages for water that was never supplied. As affirmative arguments, the Tribe claims that it is entitled to maintain this action under judicial interpretations of the Act, as well as the legislative history thereof, and under the doctrines of standing and *parens patriae.*

### B.

The general issue, stated above, was broached in one instance, at least, before the Indian Claims Commission. In *Gila River Pima-Maricopa Indian Community v. United States,* 29 Ind.Cl.Comm. 144 (1972) (*Gila River*), the government was accused of wrongful conduct relative to the water supply to the Reservation, including allotment lands. There, the Commission made the following observation relative to water rights and allotments:

> The Commission agrees with defendant that it lacks jurisdiction to adjudicate individual claims. We also agree that a portion of a tribe's water rights passes to each allottee when a reservation is allotted. *See United States v. Powers,* 305 U.S. 527, 59 S.Ct. 344, 83 L.Ed. 330 (1939); *Anderson v. Spear-Morgan Livestock Co.,* 107 Mont. 18, 79 P.2d 667 (1938). However, until the time when beneficial title to tracts of tribal land actually vests in individual allottees, the right to the use of the water remains in the tribe.

*Id.* at 149–50. The Commission did not grant judgment for defendant, but required a trial for a determination of which, if any of the lands in question were allotted, and when title thereto passed to the individual Indians. The action was transferred to the Court of Claims in 1978, 42 Ind.Cl.Comm.

202, which found that the government's liability had ended before any of the allotments were made. Consequently, the Court of Claims found it "not necessary" to determine whether such a claim was tribal or individual. *Gila River,* 231 Ct.Cl. 193, 215 n. 14, 684 F.2d 852, 865 n. 14 (1982).[7]

Absent affirmance or adoption by the Court of Claims or its successor, the Court of Appeals for the Federal Circuit, this court is not bound to follow rulings or determinations of the Commission that are pretermitted by subsequent appellate court action. Although Commission opinions are a valuable source and entitled to some weight, *see, e.g., Northern Paiute Nation v. United States,* 9 Cl.Ct. 639, 642 (1986), the Commission's observation in *Gila River, supra,* is not sufficiently endowed for this court to find it controlling on the facts of this case.

For reasons set forth below, the court holds, on the facts presented, that the Tribe has stated a tribal claim cognizable in this court. Although the court ultimately holds that plaintiff is entitled to proceed on its claim, several of the grounds it advances in support of its position must be rejected.

One of plaintiff's jurisdictional theories is based on the concept of standing. Plaintiff maintains that if it has standing to represent its members, it is asserting a tribal claim. Plaintiff's position is incorrect. *Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), one of the leading cases on standing, relied on by plaintiff, noted that "whether an association has standing to invoke the court's remedial powers on behalf of its members depends in substantial measure on the nature of the relief sought." *Id.,* 422 U.S. at 515, 95 S.Ct. at 2213. *Warth* held that an organization of construction companies did not have standing to seek damages for the profits and business lost by its members since, *inter alia,* "whatever injury might have been suffered is peculiar to the indi-

---

**7.** A similar issue was before the Claims Court in *Shoshone-Bannock Tribes of the Fort Hall Reservation, Idaho v. United States,* No. 326-C-2. There, however, the parties settled the case. The propriety of settlement in this case is discussed *infra.*

vidual member concerned * * *." *Id.* Thus, standing cannot be used when the remedy sought is monetary damages as compensation for wrongs done to the members of an organization rather than the organization itself; the organization must have an entitlement to recovery in its own right.

■ In this regard, the Supreme Court has observed, in another case cited and relied on by plaintiff: "The question of whether [a party] has standing * * * to sue on behalf of others is analytically distinct from the question of whether the substantive theory on which it relies will prevail * * *." *Moe v. Salish & Kootenai Tribes,* 425 U.S. 463, 474 n. 13, 96 S.Ct. 1634, 1641 n. 13, 48 L.Ed.2d 96 (1976). The jurisdictional act relied on here as plaintiff's "substantive theory" of recovery is the Indian Claims Commission Act, which does not provide for jurisdiction over individual claims. Simply stated, a tribe may generally have standing to represent the interests of its members without *ipso facto* having a tribal claim under the Act. This principle was recognized, at least implicitly, in *Absentee Shawnee Tribe, supra.* There, the Court of Claims accepted that the tribe had standing under the Act to represent the group involved, but found that the claims presented were individual and thus beyond the subject matter jurisdiction of the Commission and the Court of Claims. *See Absentee Shawnee Tribe, supra,* 165 Ct.Cl. at 514 and n. 6.

■ Similar to the standing issue is plaintiff's reliance on the doctrine of *parens patriae* as a basis for litigating the water claim. Application of the doctrine can be complicated, and the court does not deem a complete discussion of its nuances necessary to this opinion. *See Hawaii v. Standard Oil Co.,* 405 U.S. 251, 257–60, 92 S.Ct. 885, 888–90, 31 L.Ed.2d 184 (1972). *See generally* Annot., "State's Standing To Sue On Behalf Of Its Citizens," 42 A.L.R. Fed. 23 (1979).

For present purposes, it suffices to note two points. First, "[i]t is established that a state cannot maintain an action against the Federal Government or any Federal agency [as *parens patriae* ], since it is the United States, not the State, which represents them [citizens] as parens patriae in their relation to the Federal Government * * *." Annot., *supra,* 42 A.L.R.Fed. at 29. *E.g., Massachusetts v. Mellon,* 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078 (1923); *Pennsylvania v. Kleppe,* 174 App.D.C. 441, 533 F.2d 668, 42 A.L.R.Fed. 1, *cert. denied,* 429 U.S. 977, 97 S.Ct. 485, 50 L.Ed.2d 584 (1976). *But see, e.g., Washington Utilities & Transp. Comm'n. v. Fed'l Commun. Comm'n,* 513 F.2d 1142 (9th Cir.), *cert. denied sub. nom. Natl Ass'n of Regulatory Utility Comm'rs v. Fed'l Commun. Comm'n,* 423 U.S. 836, 96 S.Ct. 62, 46 L.Ed.2d 54 (1975); *New York v. United States,* 65 F.Supp. 856 (N.D.N.Y.1946), *aff'd on other grounds,* 331 U.S. 284, 67 S.Ct. 1207, 91 L.Ed. 1492 (1947). Since the Tribe, in relation to the Federal Government, is lower in the hierarchy of governments, somewhat akin to a state, it would seem reasonable to conclude that the Tribe cannot litigate as a *parens patriae* against the Federal Government on behalf of its members.

Plaintiff has not cited a single case arising under the Act in which the doctrine of *parens patriae* was utilized to support jurisdiction relative to a tribal claim. *Pueblo of Isleta ex rel. Lucero v. Universal Constructors, Inc.,* 570 F.2d 300, 302 n. 2 (10th Cir.1978), cited by plaintiff, although a suit by an Indian Tribe, was not brought under the Act, did not involve an allotment, and was not brought against the United States. Even then, the 10th Circuit declined to decide whether the tribe could bring the action because of its *parens patriae* relationship to its members.

■ Second, and more importantly, the cases show that the doctrine of *parens patriae* cannot be used as a means of defeating a bar to jurisdiction that would exist if other than the sovereign attempted to bring the action. Thus, original jurisdiction cases brought by a state in the Supreme Court, *see* Constitution, Article III, § 2, must be on behalf of the state and not

particular citizens thereof. *See, e.g., Hawaii v. Standard Oil Co., supra,* 450 U.S. 258–59 n. 13, 92 S.Ct. 889–90 n. 13.[8] The principle was applied to deny *parens patriae* status to Indian tribes in *Assiniboine & Sioux Tribes v. Montana,* 568 F.Supp. 269 (D.Mont.1983), in order to prevent a "side-stepp[ing]" of the Tax Injunction Act, 28 U.S.C. § 1341, by the affected individual Indians. 568 F.Supp. at 277. The court believes it would be improper to allow the Tribe to advance individual claims indirectly, under the doctrine of *parens patriae,* when it could not do so directly.

The difficulty with plaintiff's standing and *parens patriae* jurisdictional positions is that they are based on the fact that the Tribe seeks to sue on behalf of its members. Implicit in such a suit is the premise that the claims are those of individual members of the Tribe. The simple fact is that there is no provision in the Act for actions on behalf of individuals by a tribe in a representative capacity. "A claim under the Indian Claims Commission Act is not aggregation of individual claims but a group claim on behalf of a tribe and or other identifiable group." *Western Shoshone Legal Defense and Educ. Ass'n v. United States,* 209 Ct.Cl. 43, 60, 531 F.2d 495, 503, *cert. denied,* 429 U.S. 885, 97 S.Ct. 236, 50 L.Ed.2d 166 (1976). *Accord, e.g., Minnesota Chippewa Tribe v. United States,* 161 Ct.Cl. 258, 270–71, 315 F.2d 906, 913–14 (1963). Plaintiff's attempts to foreclose inquiry into the nature of the action by arguing that any individual claims are transmitted into a tribal one by virtue of the doctrines of standing or *parens patriae* only confuses the issue in this case. If plaintiff were allowed to succeed on these theories, the Act's requirement of a tribal claim would virtually be eliminated. The court declines to sanction such a result. *See Pennsylvania v. New Jersey,* 426 U.S. 660, 665–66, 96 S.Ct. 2333, 2335–36, 49 L.Ed.2d 124 (1976). Surely plaintiff does not want the court to base jurisdiction on standing or *parens patriae* and thereby place it on a sinking ship.[9]

Plaintiff argues that the legislative history of the Act "shows clearly that the claim

---

**8.** *Pennsylvania v. New Jersey,* 426 U.S. 660, 96 S.Ct. 2333, 49 L.Ed.2d 124 (1976) (*per curiam*), can be read as requiring implication of "sovereign or quasi-sovereign interests" for *parens patriae* standing or original jurisdiction cases. *See id.,* 426 U.S. at 665, 96 S.Ct. at 2335. Plaintiff maintains that no such requirement is present with respect to cases within the "classical doctrine" where the sovereign acts to protect those unable to protect themselves. *See Pennsylvania v. Kleppe,* 174 U.S.App.D.C. 441, 533 F.2d 668, 673, 42 A.L.R.Fed. 1, *cert. denied,* 429 U.S. 977, 97 S.Ct. 485, 50 L.Ed.2d 584 (1976).

Although the court believes the rationale in the text is distinct, in some sense, from the quasi-sovereign interests test, plaintiff cannot prevail even if the court's second ground is restated to include a "sovereign interest" requirement. When plaintiff argues for classic *parens patriae* standing, *i.e.,* no sovereign interest, it implicitly concedes that it is merely advancing a multitude of individual claims. Such claims are not cognizable under the Indian Claims Commission Act, regardless of by whom they are brought. *See, e.g., Absentee Shawnee Tribe of Oklahoma v. United States,* 165 Ct.Cl. 510, 514 and n. 6 (1964).

If, on the other hand, a quasi-sovereign interest is present, *parens patriae* standing is not necessary inasmuch as the interest present would invariably satisfy the tribal claim requirement of the Act and thus allow the Tribe to proceed directly thereon.

**9.** Plaintiff also maintains that it has standing as owner of the irrigation system to sue for defendant's breach in not supplying the water needed for irrigation. One of the cases it relies upon involved a state statute that expressly provided that the entity could sue to protect the interests of affected individuals. *See Orange County Water District v. City of Riverside,* 173 Cal.App.2d 137, 343 P.2d 450, 469 (1959). This case is therefore clearly inapposite to the situation at bar, and arguably its converse- here the statute and case law interpreting it clearly forbid suits advocating individual interests.

The other case plaintiff relies on held that the mutual irrigation company plaintiff could sue for the value of water wrongfully diverted, notwithstanding that the company neither sold nor rented water. *Gunnison-Fayette Canal Co. v. Gunnison Irrig. Co.,* 22 Utah 2d 45, 448 P.2d 707 (1968). Notably, the court in that case pointed out that the company was not, in distinction to plaintiff here, seeking damages for lost crops. *Id.,* 448 P.2d 708. The court reads that case as recognizing a right of recovery in the company itself, independent of the rights in the water users. Accordingly, the case does not answer the question herein, *i.e.,* whether the Tribe has a water claim in its own right independent of the water rights of the individual allottees.

here is of a kind the draftsmen of the Act sought to place within the Commission's jurisdiction." The legislative history illustrates amply that individual claims were not to come before the Commission.[10] The drafters were concerned, however, that the definitions of "tribe" and "band" might be too narrow to encompass certain groups whose claims would otherwise be within the spirit of the Act. Accordingly, an amendment was drafted "to take [in] a simple group of Indians who have a common interest, who have suffered a common injury, but who may not heretofore have been recognized by any branch of the Government." Hearings on S. 2731 Before the Committee on Indian Affairs, 74th Cong., 1st Sess. 40 (1935) (Statement of Hon. John Collier, Commissioner of Indian Affairs).[11] The noted authority on Indian law, Felix Cohen, stated that the Act "satisfied the need to provide groups not generally regarded as constituting tribes an opportunity to assert claims against the Government * * *." F. Cohen, *Handbook of Federal Indian Law* at 12 (1982 ed.).

Here, the allottees were (are) all members of the Tribe, and the Government does not question the Tribe's ability to maintain the action, apart from the nature of the claim(s) involved. There is no indication that any or all of the allottees have a communal identity apart from their membership in the Tribe. Accordingly, the court does not believe, in any event, that the allottees can properly be characterized as a group within the intendment of the Act.

■ Although this point wasn't explicitly discussed in the case, the court is of the view that *Fort Sill Apache Tribe v. United States*, 1–A Ind.Cl.Comm. 137 (1949), is relevant. In that case, all the known members of two bands of Indians were imprisoned. The bands claimed that the fact that all of their members were imprisoned made the claim a tribal one, *i.e.*, they claimed a violation of tribal rights. The Commission stated that determination of the issue depended on the substance of the cause of action asserted. It then found that the facts of the imprisonment constituted a personal wrong against the individuals and not the bands. *See id.* 141–44. *See also Fort Sill Apache Tribe, supra,* 201 Ct.Cl. at 634–35, 477 F.2d at 1362. Thus, a claim does not become tribal merely because an identifiable group of the tribe's members were adversely affected, even if that group constituted all the members of the tribe. To have a cause of action cognizable here, the claim must be for a wrong done to the Tribe *qua* Tribe.

■ The court now turns to what it considers to be the dispositive issue, to wit, "whether in this case there is a distinct cause of action resting with the tribe itself." *Fort Sill Apache Tribe, supra,* 201 Ct.Cl. at 637, 477 F.2d at 1364. For the reasons set forth in the following discussion, the court concludes that the Tribe here does have a distinct cause of action.

The starting point in this regard is the Tribe's cession of some 268,000 acres of land to defendant. It is clear that title to this land was in the Tribe and not the individual Indians—they were powerless to convey title to the tract. *See* 8 Cl.Ct. at 480–81. Consequently, this court held previously that the Agreement of July 20, 1906 had to be construed as being between the Tribe and defendant. 8 Cl.Ct. at 481–82 n. 9.

In the court's view, the only "real" consideration flowing to the Tribe for the ces-

10. The reason for not allowing individual claims before the Commission was the burden they would put on the Commission's resources. *See, e.g.,* Hearings on S. 2731 Before the Committee on Indian Affairs, 74th Cong. 1st Sess. 36 (1935) (Statement of Hon. John Collier, Commissioner of Indian Affairs). It is therefore proper for this court to make sure that the claim is indeed a tribal one in fact, rather than a collection of individual claims hiding under the label of standing or *parens patriae. See Pennsylvania v. New Jersey, supra* note 7, 426 U.S. 665, 96 S.Ct. 2335 n. 7.

11. The court recognizes that the language ultimately adopted differed from that discussed in the hearings cited in the text. The court believes, however, it is clear that the intent behind the language adopted was as described above.

sion of the 268,000 acres was the promise of irrigated allotments (including the irrigation system) and $300 to each head of a family. *See White Mountain Apache Tribe v. United States,* 10 Cl.Ct. 115, 119–20 (1986). The lands set aside for grazing and timber already belonged to the Tribe; allowing the Tribe to keep these lands can hardly be characterized as consideration flowing to it.

In the court's view, this consideration created a special duty or obligation to the Tribe. In the great majority of Indian cases, the treaties or agreements involved created tribal rights and gave no rights to individual Indians. *Hebah v. United States,* 192 Ct.Cl. 785, 789, 428 F.2d 1334, 1337 (1970). *See, e.g., Sac and Fox Indians of Mississippi in Iowa v. Sac and Fox Indians of Mississippi in Oklahoma,* 220 U.S. 481, 484, 487, 31 S.Ct. 473, 474, 476, 55 L.Ed. 552 (1911). If, however, the treaty provision "concerns the rights of and obligations to individual Indians, members of the * * * Tribe," claims thereunder are individual and may not be asserted by the tribe. *See Sioux Tribe of Indians v. United States,* 89 Ct.Cl. 31, 38 (1939), *quoted in Hebah v. United States, supra,* 192 Ct.Cl. 790, 428 F.2d at 1337. In *Hebah,* the Court of Claims based its conclusion that the claim therein was individual on the fact that "[t]he tribe [was] not to be the channel or conduit through which reimbursement [was] to flow." *Id.* at 790, 428 F.2d at 1338.

Here, the court believes that the Tribe was to be the "conduit" through which the consideration, *i.e.,* the promised water, flowed. The earlier opinion in the companion case held that the irrigation system necessary to irrigate the allotments was Tribal property. 8 Cl.Ct. 485–86. The court now holds that Tribal waters before the July 20, 1906 agreement continued to be Tribal waters subsequent to the said agreement subject to right of use in and by the allottees and their legal successors.

The *Powers* case held that allottees have "the right to use some portion of *tribal* waters essential for cultivation." *Powers,*

*supra,* 305 U.S. at 532, 59 S.Ct. at 346 (emphasis added). One commentator has stated: "At least until an allotment is patented in fee, all rights to water used on it belong to the tribe. Allotment of a reservation only earmarks a portion of the tribe's irrigation water for use on allotment." D. Getches, "Water Rights on Indian Allotments," 26 S.D.L.Rev. 405, 419 (1981). Under 25 U.S.C. § 348 (1982) (General Allotment Act of 1887) an allotment becomes patentable 25 years after allotment. Thus, it would not be unreasonable to conclude that from July 20, 1906 until July 20, 1931, at the very least, all rights to water use from the Walker River belonged to the Tribe. Subsequent to July 20, 1931, one could argue that water use rights belonged to each individual allotment owner and not the Tribe.

It appears, then, that the Tribe, at least until July 20, 1931, owned or would have owned, if provided, the water supply necessary to make the irrigation system functional. Allottees could, however, insist on the water reasonably necessary, to the extent it was available, to irrigate their allotments, assuming said lands were placed in agricultural production. The court does not view this interpretation as being at odds with any of the cases cited by defendant. That is, it does not diminish the allottees' water rights to hold that the water and irrigation system belong to the Tribe with a concomitant right to delivery of water in the allottees. In this regard, it has been noted that allottees are conceivably subject to some tribal regulation regarding their water use. *See* Getches, *supra,* 26 S.D.L.Rev. 429–33. *See also* 8 Cl.Ct. 484 n. 11.

In sum, the court is of the opinion that the facts of this case justify a holding that the government incurred, under the July 20, 1906 Agreement, an obligation to undertake to provide the Tribe with a water supply for its irrigation system. The Tribe, in turn, was obligated to deliver, if possible, water to allottees for use in irrigation.

So construed, plaintiff has a tribal claim for breach of defendant's obligation.[12]

Quite apart from the question of to whom the obligation to supply water was owed, there is precedent for holding that the claim here is tribal in nature. Although none of the cases relied on by the parties is on all fours with the case at bar, the court finds that the holding in *United States v. Creek Nation*, 201 Ct.Cl. 386, 476 F.2d 1290 (1973) (*Creek Nation*), is more applicable to the facts of the case at bar than any of the other cases discussing the issue of tribal versus individual claim.

In *Creek Nation*, the plaintiff tribe ceded 5,200,000 acres of land in Alabama, principally in exchange for defendant's reserving some 2,187,200 of this same 5,200,000 acres for the temporary use of and ultimate fee possession by individual Creek chiefs and family heads. For those Creek Indians who decided to sell their tracts within the 2,187,200 acres, the treaty promised a "fair consideration." Soon after the treaty was entered into, speculators and others "swarmed" into the area and began separating the Indians from their reserves (tracts) by gross frauds or worse. *See, e.g., id.*, 201 Ct.Cl. at 397, 476 F.2d at 1296–97. The end result was that the Creeks never received their reserves in fee or a fair consideration therefor, and were, subsequently, removed to lands west of the Mississippi.

In its lawsuit, the Creek Nation claimed it received inadequate consideration for the 5,200,000 acres ceded. The government did not object to paying the difference between the treaty consideration and the value of the land not part of the reserve scheme, but it did object to paying for the land set aside for the individual Creeks, *i.e.*, the 2,187,200 acres. One of the key issues in the case was whether the claim regarding the 2,187,200 acres was tribal or individual.

The Commission found, *see* 26 Ind.Cl. Comm. 410, 417 (1971), and the Court of Claims agreed, 201 Ct.Cl. 408, 476 F.2d 1303, that the government did not make a bona fide attempt to settle the Creeks on the reserved lands.[13] Further, it was found by the Commission and approved by the Court of Claims that the government knew or should have known that the patents were not likely to vest in the individual Creeks. *Id.* As a result, the Court of Claims held that:

[U]nder the facts and circumstances of this case where the *whole* individual-reserves scheme constituted unconscionable treaty consideration, the tribe can present a valid claim under the Indian Claims Commission Act.

*Id.* 201 Ct.Cl. at 409, 476 F.2d at 1304 (emphasis original).

In its opinion, the Court of Claims noted that the case did not involve a claim by individuals for frauds committed against them individually or for individual losses. Instead, quoting the concurring opinion in the Commission's opinion, the court stated:

The rights which have been allegedly violated are those of the tribe. *The 5,200,000 acres was tribal property.* The treaty by which it was ceded to the United States was negotiated by representatives of the tribe on behalf of the tribe. Although rights of individuals may also have been violated, the wrongdoings complained of were only to the tribe.

*Id.*, 201 Ct.Cl. at 409–10, 476 F.2d at 1304 (quoting 26 Ind.Cl.Comm. at 434 (Commissioner Davis, concurring)).

Thus, in the case at bar and in *Creek Nation*, both Tribes ceded certain lands to the government pursuant to an agreement or treaty. The primary consideration for

---

**12.** It is important to note that the court here is only determining that plaintiff has a tribal claim that it can maintain as against defendant's charge of lack of jurisdiction. The questions of breach and damages are not now before the court for final decision. These matters are touched on, *infra,* only in the hope of generating an atmosphere that might lead to settlement negotiations between the parties.

**13.** Although not explicitly set forth in the opinions, it must also be concluded that the government failed in its obligation to ensure a "fair consideration" for the lands that were sold.

the transfer in both cases would have benefitted individual members of the tribes. In *Creek Nation,* the consideration was not delivered under circumstances that constituted a breach of defendant's obligation, whether phrased in terms of fair and honorable dealings or otherwise.[14] In this case, it is premature to hold that defendant breached its obligation, although its efforts in the early years after the agreement, evidenced by some of the materials presently before the court, might suggest such a conclusion. Such a holding goes, however, to the merits of the claim, which are not now before the court. With respect simply to the nature of the claim, the question in both cases is the same, *viz.,* whether a tribal claim is presented when the government obligates itself pursuant to a treaty (agreement) with a tribe to take certain action that would ultimately benefit individual tribal members and then fails, entirely or at least materially, to fulfill the obligation. *Creek Nation* held that a claim of this character was tribal, and this court finds that holding quite pertinent relative to the facts and circumstances of this case.

The two cases defendant relies upon most heavily for its position that the claims presented herein are individual are *Absentee Shawnee Tribe, supra,* and *Cherokee Freedmen, supra.* The court finds that these cases are more distinguishable from the instant case than *Creek Nation, supra.*

■ *Absentee Shawnee Tribe* is somewhat similar to *Creek Nation* and involved allotments that were made to individual Indians who were defrauded out of them. There was not, however, the wholesale fraud and intimidation found in the *Creek Nation* case, *i.e.,* the number of individuals affected was relatively small. As the Court of Claims observed:

> The main injuries this proceeding seeks to redress are just such individual losses

to the separate members of [the] group who * * * were caused to give up their individual allotments for less than fair value.

*Absentee Shawnee Tribe, supra,* 165 Ct. Cl. at 514–15. Where, as here, a tribe claims damages for a failure of consideration, it is essentially seeking, as was recognized in *Creek Nation,* redress for a wrong done to it, *i.e.,* the loss of tribal lands. In this regard, it is noted that the court in *Absentee Shawnee Tribe,* stated that the wrongs did not "trench upon any group rights." *See Absentee Shawnee Tribe, supra,* 165 Ct.Cl. at 517. *See also Ponca Tribe v. United States,* 6 Ind.Cl.Comm. 409 (1958). More importantly, there was no treaty provision imposing any specific obligation on defendant with respect to the allotments. Both the Commission and the Court of Claims relied on this fact to distinguish *Absentee Shawnee Tribe* in *Creek Nation. See Creek Nation, supra,* 26 Ind. Cl.Comm. 418–19, 201 Ct.Cl. 409, 476 F.2d 1304. Here, the claim is based upon a "promise[ ] made to the tribe," 26 Ind.Cl. Comm. at 419, and, properly construed, it is not seeking redress for individual wrongs. Consequently, *Absentee Shawnee Tribe* is inapposite.

*Cherokee Freedmen, supra,* the other principal case relied on by defendant, is easily distinguished from the instant case. The plaintiffs in that case were a group of Cherokee Freedmen who alleged that they were improperly refused enrollment in the Cherokee Nation and thereby suffered injury by not receiving allotments of Cherokee land then being divided. The court held that claims were individual since "[t]heir resolution would depend upon individual proof as to each Freedman that he was qualified, under the general standards laid down in the [relevant] treaty, to be enrolled as a Cherokee." *Cherokee Freedmen, su-*

---

**14.** The Commission found a breach of the duty to pay conscionable consideration as well as of the duty to deal fairly and honorably. *Creek Nation v. United States,* 26 Ind.Cl.Comm. 410, 419–21 (1971), *aff'd,* 201 Ct.Cl. 386, 476 F.2d 1290 (1973). The Court of Claims in its holding and discussion thereof only made reference to

unconscionable consideration. *See id.,* 201 Ct.Cl. at 409, 476 F.2d at 1304. Although plaintiff here does not allege unconscionable consideration, the court views its claim as analogous inasmuch as it is essentially claiming a failure of consideration in exchange for its ceded land.

*pra*, 161 Ct.Cl. at 789.[15] Here, by contrast, the claim can be evaluated without considering "the individual facts and circumstances pertinent to [a] particular person." *Id*.[16] Further, the court in *Cherokee Freedmen* simply stated that there was "no common right or group interest." *Id.*

In *Fort Sill Apache Tribe, supra*, a case also cited by defendant, the court said that the "critical issue" was "whether there is a distinct cause of action and right resting with the tribe itself." *Fort Sill Apache Tribe, supra*, 201 Ct.Cl. at 637, 477 F.2d at 1364. In discussing *Cherokee Freedmen*, the court in *Fort Sill* was of the opinion that:

> [W]hile * * * true under those facts, it provides little assistance in attempting to determine under the facts now before the court, whether the claim of these appellants is a valid assertion of a group interest or right which the court might recognize within the language of the Act.

*Fort Sill Apache Tribe, supra*, 201 Ct.Cl. at 638, 477 F.2d at 1364.

The plaintiff tribe in *Fort Sill* had been forcibly relocated several times and its members "interned as prisoners of war" for 27 years. *See id.*, 201 Ct.Cl. 633–34, 477 F.2d 1361. The tribe brought suit under clauses (2) (relating to "claims in law or equity, including those sounding in tort") and (5) (relating to "fair and honorable dealings") of Section 2 of the Act, 25 U.S.C. § 70a, claiming damages "for injuries to the tribe's traditional power and structure

resulting from the years of internment." *Id.*, 201 Ct.Cl. at 634, 477 F.2d at 1362.[17]

Regarding clause (2), the court concluded that the Act was not intended to cover the type of claim presented. *See id.*, 201 Ct. Cl. at 638, 477 F.2d at 1364 (citing *Gila River Pima-Maricopa Indian Community v. United States*, 190 Ct.Cl. 790, 427 F.2d 1194, *cert. denied*, 400 U.S. 819, 91 S.Ct. 37, 27 L.Ed.2d 47 (1970)). The court viewed the injury to the tribe as "subsumed by the multitude of individual claims" and held that under clause (2):

> [T]he Act does not recognize in the tribe a separate and distinct right to recover for injuries so closely tied to those suffered personally by individual Indians, which injuries are the whole basis for any damage to the tribe as such.

*Fort Sill Apache Tribe, supra*, 201 Ct. Cl. at 639, 477 F.2d at 1365.

With respect to clause (5), the court phrased the issue as whether "the United States has undertaken a special duty to protect and foster the traditional power and structure of the tribal organization." *Id.*, 201 Ct.Cl. at 640, 477 F.2d at 1365. Although the court observed that it was conceivable that the government might undertake the responsibility of protecting a given tribe's (tribal) structure, thereby creating a "definable group interest", it could not find such an obligation on the materials presented to it. *See id.*, 201 Ct.Cl. 640–42, 477 F.2d 1365–66.

The court deems two observations regarding *Fort Sill* to be pertinent here.

---

15. A similar rationale was also expressed in *Absentee Shawnee Tribe of Oklahoma v. United States*, 165 Ct.Cl. 510 (1964), in finding that the claim was individual. There, the court said the claim, especially damages, "would clearly depend upon proof of the special facts and circumstances pertinent to the particular * * * Shawnee [affected]." *Id.* at 515. *See also Warth v. Seldin*, 422 U.S. 490, 515–16, 95 S.Ct. 2197, 2213–14, 45 L.Ed.2d 343 (1975).

16. In its presentations, and particularly at oral argument, defendant argued, in *in terrorem* fashion, that some 500 individualized investigations and determinations would be necessary to determine damages. Although, as discussed *infra*, some approaches to damages may encompass inquiries of an individual nature and thus give credence to a charge of individual nature, there are other methods available that do not involve such a problem.

17. Notably, the tribe was not seeking damages for the false arrest and imprisonment of each individual member, apparently conceding the correctness of the Commission's holding, 1–A Ind.Cl.Comm. 137, 141 (1949), that such claims were, as the Court of Claims characterized them, "little more than multiple individual claims." *Fort Sill Apache Tribe of Oklahoma v. United States*, 201 Ct.Cl. 630, 635, 477 F.2d 1360, 1362 (1973), *cert. denied*, 416 U.S. 993, 94 S.Ct. 2406, 40 L.Ed.2d 772 (1974).

First, the land ceded in the case at bar was that of the Tribe's. When it got nothing, *i.e.*, the benefits for its members, for this land, it suffered a loss that is not subsumed by the harm also suffered by the allottees. Second, and more important, the 1906 Agreement can, under the circumstances, be read as establishing a specific obligation on defendant's part to help establish an agricultural economy on the Reservation. The availability of water was critical to this effort. As the earlier opinion pointed out:

> The overall objective of the government was to turn the Pah Ute Indians into farmers, keeping them on the reservation and making them self-sufficient. The Pah Ute Indians could not achieve those goals on its arid reservation lands without an irrigation system [and water therefor]. It appears that a *quid pro quo* arrangement existed, *i.e.*, an exchange of tribal lands for an irrigation system [including the necessary water] *and an opportunity to become farmers.*

8 Cl.Ct. at 487 (emphasis added).

In sum, the court holds that plaintiff's claim can be construed, under the facts and circumstances of this case, as stating a tribal one under *Hebah, Creek Nation,* and *Fort Sill Apache Tribe.* Although a contrary result has surface appeal, the court feels it would result in an injustice and would be inconsistent with the purposes of the Act. It has been said that the Act had as its goal "paying for specific deprivations of land or property or rights protected by treaty, statute, or then-existing law." *Gila River Pima-Maricopa Indian Community v. United States, supra,* 190 Ct.Cl. at 802, 427 F.2d at 1200–01 (Davis, J., concurring). If the defendant were to avoid any inquiry relative to the steps it took in fulfilling its obligations under the 1906 Agreement to supply water, or regarding the damages it caused by its failure to do so, the result would be, assuming plaintiff's other contentions to be true, tantamount to sanctioning a "specific deprivation[ ]" of land, *i.e.*,

the cession of some 268,000 acres of tribal land to defendant for what turned out to be grossly inadequate consideration and empty promises.

If the court must err, it prefers to do so in favor of allowing the Tribe to present its claim. *See Northern Paiute Nation v. United States,* 225 Ct.Cl. 275, 292, 634 F.2d 594, 604 (1980) ("Any doubts as to the scope of the interest conferred on plaintiff * * * are to be resolved in favor of the Indian wards as against the guardian United States."). *See also Wilson v. Omaha Indian Tribe,* 442 U.S. 653, 666, 99 S.Ct. 2529, 2537, 61 L.Ed.2d 153 (1979) (doubtful expressions in statutes passed for the benefit of Indian groups are to be liberally construed in favor of the groups); *Pueblo of Isleta ex rel. Lucero v. Universal Constructors, Inc., supra,* 570 F.2d at 302 (declining to apply "subtle principles of English common law applicable to land titles" to deprive court of jurisdiction over Indian claim).

### III.

The court only holds that it has jurisdiction under the Indian Claims Commission Act to hear plaintiff's claim. This holding satisfies just two of the four elements set forth in *Aleut Community of St. Paul Island v. United States,* 202 Ct.Cl. 182, 480 F.2d 831 (1973) (*Aleut Community*), for finding a breach of the duty of fair and honorable dealings. The court there stated: "There must be a showing that the United States undertook an obligation, a 'special relationship', the obligation was to the Tribe, that the United States failed to meet its obligation, and that as a result the Tribe suffered damages." *Id.,* 202 Ct.Cl. at 196, 480 F.2d at 839. Here, the court has simply found that the United States undertook an obligation and that the obligation was owed to the Tribe. The questions of breach and damages thus remain for resolution. Although these issues are not determined herein, it is deemed appropriate, under the circumstances (*see* n. 12, *supra*), to offer some comments thereon.[18]

---

**18.** Defendant rested its motion for summary judgment on the grounds of jurisdiction, and plaintiff's captioned motion for summary judg-

ment regarding liability presumed that a breach exists; its briefs were devoted almost entirely to the issue of jurisdiction. Since the issue of

With reference to breach by the government of an obligation owed the tribe, the inquiry, to paraphrase the Court of Claims, is: "Did the Federal Government do whatever it was required to do, in the circumstances, to [secure water for the Reservation]?" *Oneida Tribe of Wisconsin v. United States,* 165 Ct.Cl. 487, 494, *cert. denied,* 379 U.S. 946, 85 S.Ct. 441, 13 L.Ed.2d 544 (1964). Here, there is some evidence before the court that the government developed plans for extending the then existing irrigation system as well as studied other possible sources of water, including a reservoir, than the "regular" flow of Walker River. *See* 8 Cl.Ct. 475–77. Further, the United States entered a suit, on behalf of the Reservation, to secure rights to water in the Walker River. *See* 8 Cl.Ct. 475 n. 5. The end result of the government's efforts, however, was merely a 1400 acre increase in the amount of irrigated lands. Certainly the Indians, and probably the government also, contemplated that the cession of some 268,000 acres of valuable mineral land would bring more of a benefit to the Reservation. Although there might be a justification or rationale for the government's failure to develop more irrigable land, at first blush it is difficult to conceive of how the government could satisfy its obligation under the 1906 Agreement with such meager tangible results.

Plaintiff suggests four potential measures for breach damages, to wit: the value of the crops that could not be grown, the value of the water that was not delivered, the diminution in the rental value of the land, or the loss to the Tribal economy.[19] At this juncture, two of the theories would appear to be improper measures for recovery under the Act.

■ Lost crop revenues and diminished rental values seem to be harms suffered directly by the individual allottees. The Tribe, under the circumstances found here,

would appear to have no right to or interest in the revenues to be generated by the allottee in cultivating or renting his land. Further, establishing the amount involved "would clearly depend upon proof of the special facts and circumstances pertinent to the particular [allottee]." *Absentee Shawnee Tribe, supra,* 165 Ct.Cl. at 515. *Accord, e.g., Cherokee Freedmen, supra,* 161 Ct.Cl. at 789. The Tribe is not allowed to recover, under the Act, for the harms suffered by its members. *See, e.g., Fort Sill Apache Tribe, supra,* 201 Ct.Cl. 634–35 and n. 4, 637, 477 F.2d 1362 and n. 4, 1365. The *Gila River* case, *supra,* relied on by plaintiff as precedent for its crop damage approach, is not appropriate since it did not involve allottee Indians. In *Gila River,* the crop damage was Tribal since the reservation land therein was not allotted during the damage period for which recovery was allowed by the court.

■ The value of the water not delivered does not seem to be improper, and it might not be an impossibly complicated method of determining damages. This measure was utilized in *Gunnison-Fayette Canal Co. v. Gunnison Irrig. Co.,* 22 Utah 2d 45, 448 P.2d 707 (1968), in awarding damages to a mutual irrigation company to compensate it for water wrongfully diverted by the defendant therein. It is worthy of note that damages were awarded in that case notwithstanding that the plaintiff irrigation company neither sold nor rented (nor used, apparently) water. *See id.,* 448 P.2d 708. Damages may, however, be limited by the amount of water the Indians could have used beneficially. *See Gila River, supra,* 231 Ct.Cl. at 213–14 and n. 12, 684 F.2d 864–85 and n. 12, *construed in Gila River Pima-Maricopa Indian Community v. United States,* 9 Cl.Ct. 660, 699 (1986).

---

breach and duration thereof were not addressed in sufficient depth to allow the court to rule thereon in any meaningful way, plaintiff's motion, if construed as one seeking court approval that a breach has been established, must be denied without prejudice.

**19.** Possibly to avoid limiting itself to these four theories, plaintiff also acknowledges that "some other" measure of damages might be appropriate.

Plaintiff's final suggested measure of damages is the loss to the Tribal economy. This damage measure is somewhat similar to the analysis made in *Aleut Community, supra.* There, the Indians were dependent upon the harvest of seals for their livelihood. The United States recognized this fact, and the court found, under the circumstances, that the government was obligated "to protect the [Indians] in securing their 'comfort, maintenance, * * * and protection,'" *i.e.,* to preserve and protect their economic well-being. *Aleut Community, supra,* 202 Ct.Cl. at 197, 480 F.2d at 839. The Indians alleged that the company granted the exclusive right by the government to purchase seal furs had, with the cooperation and acts of the government, "forced [them] into a state of dire poverty," principally by the payment of minimal wages for their efforts in seal harvests. *Id.,* 202 Ct.Cl. at 199–200, 480 F.2d at 840–41.

The Court of Claims held that these allegations stated a claim for breach of fair and honorable dealings and directed an inquiry relative to the profits of the sealskin monopoly to determine whether the available profits, if any, were used to maintain the Indian economy. If the economic conditions were bad, and if there were profits that could and should have been used to improve the local economy, the court held that such profits "would establish the measure of damages." *Id.,* 202 Ct.Cl. at 200, 480 F.2d at 841.

Whether the approach of *Aleut Community* could be successfully applied to the circumstances of the case at bar is an open question and one which the court refuses to decide at this time. Although that case arguably sanctions recovery for damage to a tribe's economy, the facts therein are somewhat different from those of the instant case—in the *Aleut Community* case there was a specific obligation, which was clearly recognized; the economy and society were very easily defined, as well as communal in nature; and there existed a definite manner of ascertaining damages.

The questions regarding the applicability *vel non* of *Aleut Community* are illustrative of the problems presented by this lawsuit. At each step of the analysis in this case, questions are raised to which there are no readily apparent and conclusive answers. The parties expend time and energy mustering support for their respective positions on these questions, and then the court endeavors to resolve them fairly and correctly. Notwithstanding the efforts of all concerned, the court is the first to admit that the results reached have been ones with which reasonable minds might disagree.

The essential facts of this case can, however, be stated simply: The Tribe ceded 268,000 acres of valuable mineral lands, principally in exchange for the irrigation of some 10,000 other acres. For whatever reasons, the defendant failed to provide for the irrigation of a large portion thereof. In such a situation, fairness and honor would seem to demand that the government make *some* payment to plaintiff in order to ameliorate the loss that would otherwise be suffered.

The court recognizes that ascertaining an amount justly due the Tribe could be complex and speculative. The court firmly believes, however, that justice can be done and served in this matter effectively, with less litigation expense and expenditure of time of all concerned, by means of a settlement effected by the parties themselves. As noted above, *see supra* n. 7, a case involving issues very similar to those herein was settled. The court does not believe there is any reason why the water issue, as well as the irrigation system issue, cannot be settled *if the parties act responsibly and reasonably.* A professional approach to these matters warrants, at the very least, good-faith negotiations by the parties.

## IV.

For the reasons set forth above, defendant's motion for partial summary judgment

is denied with prejudice and plaintiff's cross-motion for summary judgment on liability is denied without prejudice. The parties are directed to advise the court whether, in light of this opinion, the water and irrigation claims of the Walker River Tribe have a probability of settlement. If there is no probability of settlement, the parties are to advise the court what their views are on disposing of these issues. Such a status report shall be filed with the court by the parties, after consultation with each other, within sixty (60) days from the date of this opinion.